WINSTON F. C. GUEST AND LUCY C. GUEST, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8844–76.     Filed July 2, 1981.

---

*Don Scott DeAmicis*, for the petitioners.
*David M. Brandes*, for the respondent.

HALL, *Judge*: Respondent determined deficiencies in petitioners' income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1968 | $82,843.65 |
| 1969 | 249,982.10 |
| 1970 | 229,412.30 |

Due to concessions of the parties, the only issues remaining for determination are: (1) Whether petitioners made a completed gift to a charity of certain parcels of real property or whether petitioners gave the proceeds from the sale of the properties; (2) whether petitioners' charitable contribution was made in 1969 or 1970; and, (3) assuming petitioners made a gift of the properties, (a) whether petitioners realized gain to the extent the outstanding mortgages encumbering the properties exceeded petitioners' adjusted basis in the properties at the time of the gift, and (b) the amount of charitable contribution petitioners are entitled to under section 170.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Winston F. C. Guest (petitioner) and Lucy C. Guest,[2] husband and wife, resided in Palm Beach, Fla., at the time they filed their petition in this case.

In 1959, petitioner purchased two groups of properties (the properties) known as the Sandringham Properties and the Aberdeen Properties. Petitioner acquired the Sandringham Properties for $31,500 cash and took the properties subject to nonrecourse mortgages of $1,962,000. The Aberdeen Proper-

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[2] Lucy C. Guest is a petitioner solely by virtue of having filed a joint return with her husband.

ties were acquired for $36,000 cash and were subject to a nonrecourse mortgage of $1,027,000.

At the time petitioner acquired the properties, he also purchased the outstanding shares of Sandringham Properties, Inc., for $250, and the outstanding shares of Aberdeen Properties, Inc., for $250. Sandringham Properties, Inc., was solely liable on the mortgages encumbering the Sandringham Properties, and Aberdeen Properties, Inc., was solely liable on the mortgage encumbering the Aberdeen Properties.[3]

The Sandringham Properties are located in the States of Pennsylvania, Illinois, and Missouri. H.R.B.-Singer, Inc., held a long-term lease on the Pennsylvania property, and Singer Sewing Machine Co. held long-term leases on the Illinois and Missouri properties. (H.R.B.-Singer, Inc., and Singer Sewing Machine Co. will be referred to collectively as Singer.) Singer guaranteed the mortgages encumbering the Sandringham Properties. The Aberdeen Properties are located in the States of Delaware, Washington, Pennsylvania, and Oregon, and various Kinney Shoe Store corporations held long-term leases on them. G. R. Kinney Corp., the parent of the lessees, guaranteed the mortgage encumbering the Aberdeen Properties.

The leases on the various Aberdeen Properties are essentially identical in form, and the leases covering the several Sandringham Properties are also very similar.

The leases covering the Aberdeen Properties were for 25-year terms renewable at the lessee's option for 4 terms of 5 years each. Under the terms of the leases, the lessees were required to pay all taxes and maintenance costs and to maintain fire, casualty, and liability insurance on the premises. In addition, the lessees were required to pay monthly rentals. Each lessee, provided it is not in default, has the option to terminate its lease by offering to purchase the property anytime after the end of the sixth year for a price established in the lease plus interest and accrued rents. The total purchase price provided for in the leases for all five Aberdeen Properties on December 27, 1969, was $644,857.97.

---

[3]The facts are not clear but apparently at some point in time Sandringham Properties, Inc., and Aberdeen Properties, Inc., held title to the properties.

The outstanding balance of the mortgage on December 31, 1969, was $649,307.

The Aberdeen leases were assigned to the St. Louis Union Trust Co. and an individual as trustees. Under the terms of this assignment, all rentals were paid to the trustees who, in turn, paid the monthly mortgage payments and other expenses (e.g., trustees' fees). The balance was then paid to petitioner.

The mortgage agreement encumbering the Aberdeen Properties had two special features. First, the repayment schedule called for a "balloon" payment at maturity equal to 5 percent of the original balance of the mortgage. Second, the mortgage agreement also contained a "kicker" provision calling for an additional payment to the mortgagee at maturity equal to 20 percent of the original amount of the mortgage. In lieu of this "kicker" payment, the mortgagor had the option of conveying to the trustees all of its interests in the Aberdeen Properties. The trustees would then be directed to sell the Aberdeen Properties and distribute one-half of the proceeds to the owners of the mortgage notes and the remaining proceeds to the mortgagor.[4]

The Sandringham leases were for terms of either 23 years and 2 months or 25 years, renewable at the lessee's option for six terms of 5 years each. Under the terms of the leases, the lessees were required to pay all taxes and maintenance costs and to maintain fire, casualty, and liability insurance on the premises. In addition, the lessees were required to pay monthly rentals. At various times during the lease periods, the lessees, provided they were not in default, had the right to offer to purchase the leased premises and the option to purchase the leased premises for a price which, depending on the lease and whether the purchase was pursuant to an offer or an option, was either (i) an amount established in the lease, or (ii) an amount equal to the then-appraised value of the land plus a percentage of the original cost of the buildings on the premises at the time of the purchase, or (iii) an amount equal

---

[4]In the event a lessee exercised his option to offer to purchase under a lease and ultimately did purchase, the 20-percent "kicker" provision did not apply. If, on the other hand, the mortgagor exercises his option (which is available under certain circumstances) to prepay the mortgage, the "kicker" payment is still required, discounted from the date of maturity to the date of payment at a rate of 5¼ percent.

to the then-appraised value of the land plus a fixed dollar amount set forth in the lease. The right to offer to purchase and the option to purchase are complicated provisions which led to disputes between the lessees and petitioner's successor-lessor. The total offer-to-purchase price on January 1, 1970, for all of the Sandringham Properties was $1,358,351.98. The outstanding balance of the mortgage on December 31, 1969, was $1,366,650.

The Sandringham leases were assigned to. the Mellon National Bank & Trust Co. and an individual as trustees. Under the terms of these assignments, all rentals were paid to the trustees who, in turn, paid the monthly mortgage payments and other expenses (e.g., trustees' fees). The balance was then paid to petitioner.

Petitioner's net cash flow from the properties approximated $2,700 per year.[5]

Petitioner's initial basis in the Sandringham Properties was $1,993,500; $18,000 allocated to land and $1,975,500 to improvements. Petitioner's adjusted basis in the Sandringham Properties on December 31, 1969, was $1,049,829; $18,000 allocated to land and $1,031,829 to improvements.

Petitioner's initial basis in the Aberdeen Properties was $1,063,000; $324,627.75 allocated to land and $738,372.25 to improvements. Petitioner's adjusted basis in the Aberdeen Properties on December 31, 1969, was $566,385; $276,823 allocated to land and $289,562 to improvements.[6]

Petitioner's total adjusted bases in the properties on December 31, 1969, was $1,616,214 and the total outstanding indebtedness on the properties was $2,015,957.

During the course of his ownership of the properties, petitioner took deductions on his tax returns of $1,283,752 for depreciation attributable to the properties. By 1969, petitioner no longer reported losses on his returns attributable to the Sandringham properties. (That is, the depreciation, interest, trustees' fees, and related expenses no longer exceeded rental income.) The Aberdeen Properties reached this point in 1966.

---

[5]The evidence does not establish the exact amount of petitioner's net cash flow, but does establish that it was between $2,630 and $2,800 per year.

[6]In 1966, one parcel of the initial Aberdeen Properties was disposed of, which explains the reduction in the basis of the land.

Petitioner traditionally makes various charitable gifts around the Christmas season. In December, petitioner asked his tax attorney to suggest possible charitable gifts and recipient charitable organizations. Petitioner's attorney recommended that petitioner contribute the properties to Temple Emanu-el of Yonkers (the temple). Petitioner had never visited the temple. In a letter dated December 15, 1969, petitioner informed the temple that he was contributing the properties to it. The letter stated:

I am happy to inform you that I am contributing to you certain properties which I own, in order that they may be used to further your aims and principles.

*       *       *       *       *       *       *

This gift to Temple Emanu-el is made without any restrictions, and the properties may be held by you for the production of current income, or may be sold at any time as you may determine. I have instructed my attorneys to prepare deeds transferring record ownership to you, and they await your instructions in this matter.

In a December 17, 1969, letter from Milton Hecht, the chairman of the temple's finance committee, the temple accepted petitioner's gift:

On behalf of Temple Emanu-el, I wish to thank you for your generous donation of the eight properties listed in your letter of December 15. We accept this gift, and hope to use it in a manner worthy of the spirit in which it was given.

Since it is not our policy to hold properties of this kind, we intend to sell them and realize their values currently. We have been advised that some of the properties are in states and localities where very substantial transfer taxes are involved, and that a deed to us and a subsequent deed to our prospective purchasers would seriously diminish the proceeds we hope to realize on their sale.

We therefore request that you retain title as nominee in our behalf. When we have completed our negotiations for the sale of the properties, we will instruct your attorneys to prepare deeds in the name of the purchaser, and we hope to be in touch with them shortly.

At some time after December 17, 1969, Hecht located Irwin Kallman who, acting on behalf of clients (the Kallman group), purchased the Aberdeen Properties. The Kallman group paid the temple $5,000 for the Aberdeen Properties and paid all applicable real estate transfer taxes. One deed reflecting the transfer of a parcel of the Aberdeen Properties located in the State of Delaware was dated December 31, 1969, and acknowl-

edged in the county of Palm Beach, State of Florida, on April 10, 1970. No other deeds reflecting transfers of the Aberdeen Properties were entered in evidence.

The Sandringham Properties were transferred to Korn Associates, a partnership consisting of Hecht and his wife. This transfer was made without any consideration passing from Hecht or Korn Associates to the temple. Three deeds reflecting the transfer of the Sandringham Properties from petitioner to Korn Associates were dated December 31, 1969. These deeds were acknowledged in the county of Palm Beach, State of Florida, on April 10, 1970.

Petitioner reported no charitable contributions based on his gift of the properties to the temple on either his 1969 or 1970 joint Federal income tax return.

In his statutory notice for 1969 and 1970, respondent determined that petitioner's gift of the properties to the temple was a part sale in 1970 and that petitioner realized capital gain to the extent the amount realized (the outstanding balance of mortgage indebtedness) exceeded his adjusted bases in the properties. Alternatively, respondent determined that the part sale occurred in 1969.

In his trial memorandum and at trial, however, respondent took the position that petitioner did not make a gift of the properties to the temple but rather that petitioner sold the properties in 1970 (or alternatively in 1969), and contributed the sales proceeds to the temple. Alternatively, respondent relies on the theories set forth in his statutory notice.

## OPINION

The first issue is whether petitioner, to the extent the transfer was a gift, made a completed gift of the properties to the temple or whether petitioner made a gift of the proceeds from the sale of the properties.

After carefully reviewing the record, we conclude that petitioner made, in part, a completed gift of the properties to the temple. In his letter of December 15, 1969, petitioner stated specifically that he contributed the properties to the temple, and his actions thereafter were consistent with his contribution.

The essential elements of a bona fide inter vivos gift, as set

forth in *Weil v. Commissioner*, 31 B.T.A. 899 (1934), affd. 82 F.2d 561 (5th Cir.), cert. denied 299 U.S. 552 (1936), are:

(1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, *in praesenti*; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee * * *

331 B.T.A. at 906. See 38 C.J.S., Gifts, sec. 10.

Respondent concedes that the first two elements of a gift are satisfied, but argues that the remaining elements are not present in this case.

On December 15, 1969, petitioner by letter to the temple stated: "I am contributing to you certain properties." Petitioner also indicated in his letter that he instructed his attorneys to prepare appropriate deeds transferring the properties to the temple pursuant to its instructions. On December 17, 1969, the temple, in a letter from Hecht as chairman of the finance committee, unequivocally accepted petitioner's gift: "We accept this gift, and hope to use it in a manner worthy of the spirit in which it was given." The temple, however, requested petitioner to retain title to the properties as its nominee until it completed negotiations to sell the properties. This arrangement saved significant transfer taxes. Ultimately, petitioner deeded the properties to Hecht and the Kallman group pursuant to the temple's instructions to him.

Respondent focuses his argument on the requirement of delivery. The question is whether delivery of a deed to real property to a donee's designees satisfies the element of a completed gift that delivery be made by the donor to the donee. It is well established that actual, constructive, or symbolic delivery of the gift must be made to the donee or to his agent. *Dulin v. Commissioner*, 70 F.2d 828 (6th Cir. 1934), affg. in part and revg. in part 25 B.T.A. 1259 (1932); 38 C.J.S., Gifts, sec. 18. It is also well established that when delivery is made to a third party for the benefit of the donee, the delivery will be sufficient if the third party is a trustee for the donee. *Dulin v. Commissioner, supra*; 38 C.J.S., Gifts, sec. 25. It is enough if the donor delivers the property to himself as trustee

for the donee. *Stern v. Commissioner*, 15 T.C. 521 (1950); see *Duke v. Commissioner*, 23 B.T.A. 1104 (1931), affd. 62 F.2d 1057 (3d Cir.), affd. 290 U.S. 591 (1933).

Petitioner does not argue that the delivery requirement was satisfied through delivery to himself as trustee for the temple. Indeed, delivery was not effected by virtue of petitioner's retention of the properties as the temple's trustee because there was no actual legal transfer of ownership. *Londen v. Commissioner*, 45 T.C. 106 (1965). In *Londen*, deductibility under section 170 turned on the "points in time at which petitioner placed the shares beyond his control." 45 T.C. at 108. Here, as in *Londen*, no evidence establishing a trust relationship was presented and the petitioner retained substantial control until actual title to the properties was transferred to the purchasers. Petitioner's obligation, legal or moral, to make a gift of the properties is not synonomous with his implementation of that obligation. 45 T.C. at 110.

The present case is analogous to those cases where delivery is made to an agent or trustee of the donee. The temple specifically designated Hecht and the Kallman group to receive the properties in its stead. When petitioner deeded the properties to the purchasers, he effectively placed the properties beyond his control. We see no difference between the situation where a donee appoints a person to act as his agent in accepting delivery of a gift and where a donee sells a gift prior to actual receipt of it, and, instead of accepting delivery himself, the donee directs that delivery be made to the purchaser. Clearly, petitioner did not sell the properties to the buyers. He did not negotiate with nor enter into a contract of sale with the buyers, and he did not receive the sales proceeds. He intended to make a gift of the properties to the temple. We conclude that petitioner did make a bona fide gift of the properties to the temple upon deeding the property to Hecht and the Kallman group.

The second issue is whether petitioner made his charitable contribution in 1969 or 1970.

In his statutory notice respondent determined that the gift was made in 1970, but asserted alternatively that the gift was made in 1969. Petitioner contends that respondent's use of alternative years requires us to shift the burden of proof to respondent. There is no support for petitioner's contention.

The burden of proof remains on petitioner. *Dulin v. Commissioner,* 25 B.T.A. 1259, 1270 (1932); Rule 142(a), Tax Court Rules of Practice and Procedure. See *Hoeme v. Commissioner,* 63 T.C. 18 (1974); *Meyer v. Commissioner,* 46 T.C. 65 (1966), affd. on this point 383 F.2d 883 (8th Cir. 1967).

A charitable contribution is deductible under section 170 by a cash basis taxpayer in the year paid. Secs. 1.170–1(a), 1.170A–1(a), Income Tax Regs.[7] Ordinarily, a contribution of property is made at the time delivery is effected. Secs. 1.170–1(b), 1.170A–1(b), Income Tax Regs.

The deeds transferring title to the Sandringham Properties to the purchasers are dated December 31, 1969. However, the deeds were not acknowledged until April 10, 1970. Petitioner testified that he did not remember when he signed the deeds. We conclude that, despite the December 31, 1969, date on the Sandringham deeds, they were neither executed nor delivered to the purchasers until April 10, 1970. Petitioner failed to carry his burden of establishing that the deeds were executed and delivered in 1969.

The deed transferring title to the Delaware parcel of the Aberdeen Properties is also dated December 31, 1969, and acknowledged on April 10, 1970. Petitioner also testified that he did not remember when he signed this deed. As was the case with the Sandringham deeds, we conclude that, despite the December 31, 1969, date on this deed, it was neither executed nor delivered to the purchasers until April 10, 1970. Petitioner again failed to carry his burden of establishing that this deed was executed and delivered in 1969.

As to the remaining Aberdeen properties, petitioner introduced no evidence bearing on the question of when the deeds were executed, acknowledged, and delivered. Since the burden

---

[7]Sec. 1.170–0, Income Tax Regs., provides:

"Effective dates.—Except as otherwise provided in this section, the provisions of sec. 1.170 and secs. 1.170–1 through 1.170–3 are applicable to contributions paid in taxable years beginning before January 1, 1970, and all references therein to sections of the Code are to sections of the Internal Revenue Code of 1954 prior to the amendments made by section 201(a) of the Tax Reform Act of 1969 (83 Stat. 549). Except as otherwise provided therein, secs. 1.170A through 1.170A–11 are applicable to contributions paid in taxable years beginning after December 31, 1969. In a case where a provision in secs. 1.170A through 1.170A–11 is applicable to a contribution paid in a taxable year beginning before January 1, 1970, such provision shall apply to the contribution and secs. 1.170–1 through 1.170–3 shall not apply to the contribution."

was on petitioner to prove the gifts were completed in 1969 and he failed to carry that burden, we find that the gift of these Aberdeen properties was also completed in 1970. Accordingly, petitioner is entitled to a charitable deduction under section 170 in 1970.

The third issue is whether, in 1970, petitioner must recognize gain equal to the excess of the amount of the outstanding balances of the mortgage notes encumbering the properties over his adjusted bases in the properties, as respondent contends, or whether, as petitioner asserts, the gift of appreciated property to charity cannot be a taxable event.

Petitioner acquired the properties for $67,500 cash and took them subject to nonrecourse mortgages of $2,989,000. During the course of his ownership of the property, petitioner took deductions on his tax returns for depreciation in the amount of $1,283,752. Petitioner's net cash flow from the properties approximated $2,700 per year. At the time of disposition of the properties, petitioner's adjusted basis in the properties amounted to $1,616,214, and the outstanding balance of the mortgages was $2,015,957.

By 1969, petitioner no longer reported losses on his returns attributable to the Sandringham Properties (i.e., the depreciation, interest, and trustees fees no longer exceeded rents). The Aberdeen Properties reached this point in 1966. In 1970, at the suggestion of his tax lawyer, petitioner donated the properties to a qualified charity.

Thus, this Court is now squarely[8] presented with the issue whether a purported charitable gift of property subject to a nonrecourse mortgage allows the donor to escape taxation on the excess of the mortgage over the adjusted basis of the property.

This and related issues have teased tax technicians and

---

[8]In *Magnolia Development Corp. v. Commissioner*, T.C. Memo. 1960–177, this Court was faced with a similar situation. In that case, the taxpayer pledged $500 to a charitable organization. The taxpayer met this obligation by transferring stock worth $42,500 (in which the taxpayer had a basis of $10,444) to the charity. Immediately prior to this transfer, the taxpayer borrowed $42,000 secured by the stock. After receiving the stock, the charity sold it, paid off petitioner's loan, and kept the balance as petitioner's charitable contribution. Relying on a substance-over-form analysis, we held that the economic realities of the transfer were in substance a sale or other disposition of the stock, and that the amount realized thereby was $42,000.

tempted tax planners since the decision of the Supreme Court in *Crane v. Commissioner*, 331 U.S. 1 (1947).

In *Crane*, the Supreme Court held that the basis of property subject to a nonrecourse mortgage included the amount of the mortgage and that, on sale of the property, the "amount realized" included the remaining amount of the mortgage. In so ruling, the Supreme Court stated (331 U.S. at 15–16):

> The crux of this case, really, is whether the law permits her to exclude allowable deductions from consideration in computing gain. We have already showed that, if it does, the taxpayer can enjoy a double deduction, in effect, on the same loss of assets. * * * [Fn. ref. omitted.]

And, as stated more recently by the Third Circuit, affirming a decision of this Court in *Millar v. Commissioner*, 577 F.2d 212, 215 (1978):

> In calculating this gain, the Commissioner relied upon *Crane, supra,* to find that the amount realized by the taxpayers upon this exchange included the value of the nonrecourse obligation, even though the taxpayers were not personally liable for that obligation.
> * * * A finding that the taxpayers did not realize gain as a result of this exchange, after having realized the full economic benefit of this transaction, would entitle them to the type of double deduction of which the Supreme Court so clearly disapproved in *Crane*.

A similar situation is presented here. Here, as in *Crane*, the taxpayers' basis in the property was reduced below the amount of the nonrecourse liabilities by depreciation deductions. To find now that the taxpayer who has benefited from the nonrecourse indebtedness throughout his ownership may ignore it when he closes out the transaction would be to create the distortions condemned in *Crane*. This is a result to be reached only if compelled by statute or by controlling precedent. Fortunately, that is not the case. Indeed the statutory language permits, and the prior decisions of this Court call for, the contrary holding.

Insofar as the statutory context is concerned, section 1001(a) is the principal section defining gain or loss from the sale or other disposition of property for Federal income tax purposes. It provides:

> The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

Section 1002 requires that the entire amount of gain or loss on the sale or exchange of property be recognized unless otherwise provided. There are numerous exceptions and qualifications to the general rule contained in section 1002. Sec. 1.1002–1(a) and (c), Income Tax Regs. One of the more prevalent exceptions is that a taxpayer who disposes of property by gift generally does not recognize gain or loss. *Taft v. Bowers*, 278 U.S. 470 (1929). This exception stems from the perception that in the usual case a taxpayer receives nothing in exchange for making a gift, and thus his section 1001(a) "amount realized" is zero. *Withers v. Commissioner*, 69 T.C. 900, 904 (1978). However, gifts (including charitable contributions) are dispositions within the meaning of section 1001(a).[9] *Estate of Levine v. Commissioner*, 72 T.C. 780, 789 (1979), affd. 634 F.2d 12 (2d Cir. 1980); *Withers v. Commissioner, supra* at 904.

Insofar as the prior decisions of this Court are concerned, they clearly point to the holding that we make here.

In *Freeland v. Commissioner*, 74 T.C. 970 (1980), we held that relief from a nonrecourse indebtedness was sufficient to support a finding of a sale or exchange. We concluded that a sale occurred where the taxpayer voluntarily reconveyed encumbered property to the mortgagee even though the taxpayer had no personal obligation on the mortgage and had not benefited from depreciation deductions while he held the property. In doing so, we expressed our view of the rationale and impact of the Supreme Court opinion in *Crane* to be:

> while it appears that the Court was primarily interested in avoiding a situation which would permit the owner to include the amount of the mortgage in her basis for depreciation and then not offset the tax benefit derived therefrom by not including the mortgage debt in the amount

---

[9]Further support for this can be found in the recently issued regulations under sec. 1001. Sec. 1.1001–2, Income Tax Regs. See note 11 *infra*.

Compare the analysis in *Withers v. Commissioner*, 69 T.C. 900 (1978), with that in *Fincke v. Commissioner*, 39 B.T.A. 510 (1939). In *Fincke*, the Board of Tax Appeals held that the taxpayer did not realize gain on the part sale of his property at a bargain price to his children where the amount realized was equal to the taxpayer's adjusted basis but less than the fair market value of the property. The Board's holding in *Fincke* is now incorporated in the regulations. Sec. 1.1001–1(e), Income Tax Regs. As will be seen later, sec. 1011(b), which was added to the Code in the 1969 Tax Reform Act, Pub. L. 91–172, sec. 201(f), 83 Stat. 487 (1969), requires a different result—the result sought by the Government in *Fincke*—in the case of gifts to charitable organizations for which a deduction is allowed under sec. 170 by reason of a sale.

realized for computing gain, nevertheless the case stands for the proposition that upon the sale or disposition of mortgaged property the amount of the mortgage must be included in the "amount realized" for computing gain or loss. [74 T.C. at 978.]

In *Johnson v. Commissioner*, 59 T.C. 791 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974), the taxpayers borrowed approximately $200,000 each from a bank on a nonrecourse basis pledging as security in each case stock with a basis of approximately $10,800, but worth $500,000. Shortly after borrowing, the taxpayers transferred this stock, subject to the encumbrances, to trusts for the benefit of their children. We held that the transfers of the stock to the trust represented, in substance, gifts to the extent the fair market value exceeded the loans. We further held that to the extent the transfers were subject to the loans, they were sales and the taxpayers realized gain in an amount equal to the excess of the loan proceeds over their basis in the stock.[10]

Petitioner does not take the position that nonrecourse liabilities to which a property is subject are not included in the amount realized on sale; rather, petitioner asserts that the

---

[10]The Sixth Circuit in affirming *Johnson v. Commissioner*, 59 T.C. 791 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974), held that the characterization of the transfers as part sales and part gifts or as net gifts was irrelevant, and that the receipt by the taxpayers of the loan proceeds "constituted gross income in the year of receipt, under the broad definition set forth in section 61 of the Code—'all income from whatever source derived'." 495 F.2d 1083. The Sixth Circuit further held that the taxpayer realized capital gain because the "sale or exchange" language of sec. 1201(b) encompassed, at least under the circumstances, the transfers to the trusts regardless of whether such transfers were characterized as "sales" or "other dispositions."

In its opinion in *Johnson*, the Sixth Circuit also cast doubt on the precedential value of *Turner v. Commissioner*, 49 T.C. 356 (1968), affd. per curiam 410 F.2d 752 (6th Cir. 1969). Turner involved a net gift where the donee, as a condition of receiving a gift, agreed to pay the donor's gift tax liability. We have indicated in the past that despite the Commissioner's continued opposition to *Turner*, we will continue to follow *Turner* in the interest of fair play and stare decisis. *Hirst v. Commissioner*, 63 T.C. 307, 314–315 (1974), affd. per curiam 572 F.2d 427 (4th Cir. 1978); *Estate of Henry v. Commissioner*, 69 T.C. 665, 675 (1978), on appeal to the Sixth Circuit (argued July 16, 1980). In accordance with this policy, we have adhered to *Turner* in all cases involving net gifts that have thus far come before this Court. Recently, however, the Eighth Circuit has rejected the *Turner* approach to net gifts in *Diedrich v. Commissioner*, 643 F.2d 499 (8th Cir. 1981). This Court has not yet had an opportunity to reconsider its position of following *Turner* since the Eighth Circuit's opinion in *Diedrich*. In the current situation, however, we are not presented with a net gift and those cases are distinguishable. In the net gift cases, the debt arises at the time of and because of the transfer. The taxpayer does not have the use of the higher basis, as in *Crane* and in the case at issue, or of the cash withdrawn and retained by the transferor, as in *Johnson* and *Magnolia Development Corp.* Also, the transferor is secondarily liable for the gift tax in any event.

*Crane* doctrine is limited to transfers involving sales and does not apply to charitable contributions. We cannot agree. The decision in *Crane* was that nonrecourse liabilities are included in the term "amount realized" as used in the predecessor of section 1001(a). Petitioner's contention that an exception should be made for charitable contributions would require a holding that, as used in section 1001(a), the term "amount realized" means one thing for sales subject to a nonrecourse indebtedness and something else for a disposition of property subject to a nonrecourse indebtedness. As already stated, neither the equities of the transaction nor our prior decisions call for such statutory construction.

In *Johnson v. Commissioner, supra,* we have already held that the amount realized by the donor of property encumbered by nonrecourse liabilities includes the amount of those nonrecourse liabilities. In *Freeland v. Commissioner, supra,* we explained that our interpretation of the Supreme Court's *Crane* decision requires the inclusion of nonrecourse liabilities in the amount realized on the sale or other disposition of property. Here, as in *Crane,* the taxpayer's basis in the transferred property was reduced below the amount of the nonrecourse liabilities by depreciation deductions. The sole difference is that petitioner here disposed of his property by transfer to a charitable organization. We hold that that distinction does not affect the result under the ultimate logic of *Crane.* Accordingly, petitioner realized gain equal to the amount by which the outstanding mortgages at the time of the contribution (Apr. 10, 1970) exceeded his adjusted bases in the properties as determined under section 1011.[11]

---

[11]While we do not rely on the following regulation which was adopted on Dec. 11, 1980, we note that its application to the present facts also results in the nonrecourse mortgages encumbering the properties being included in the amount realized. Sec. 1.1001–2, Income Tax Regs, provides:

(a) *Inclusion in amount realized*—(1) *In general.* Except as provided in paragraph (a)(2) and (3) of this section, the amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition.

\*      \*      \*      \*      \*      \*      \*

(4) *Special rules.* For purposes of this section—

(i) The sale or other disposition of property that secures a nonrecourse liability discharges the transferor from the liability.

\*      \*      \*      \*      \*      \*      \*

(iii) A disposition of property includes a gift of the property \* \* \*

In addition, we find that petitioner's disposition of the properties is a "sale or exchange."[12] The phrase "sale or exchange" was intended by Congress to be given a broad reading, *Helvering v. Hammel*, 311 U.S. 504, 510–511 (1941); and the words themselves are to be given their ordinary meaning, *Helvering v. William Flaccus Oak Leather Co.*, 313 U.S. 247, 249 (1941). Generally, a sale is a transfer of property for money or a promise to pay money. *Commissioner v. Brown*, 380 U.S. 563, 570–571 (1965). An exchange, on the other hand, is generally a reciprocal transfer of property. *Spalding v. Commissioner*, 7 B.T.A. 588, 590 (1927); sec. 1.1002–1(d), Income Tax Regs. There is also some support for the proposition that to have a sale the seller need not receive consideration. *Russo v. Commissioner*, 68 T.C. 135, 152 (1977).

In *Freeland v. Commissioner, supra*, we examined the question of whether a voluntary reconveyance from the mortgagor to the mortgagee of property encumbered by a nonrecourse mortgage produced an ordinary or capital loss. The outcome of the case turned on whether the conveyance was a sale. In finding a sale, this Court compared the voluntary conveyance to a foreclosure sale and found no reason for distinguishing between the two. We stated (74. T.C. at 981):

In either event, the mortgagor's interest in the property is terminated and title is transferred to someone else, and the mortgagor receives nothing out of the transaction. * * * There is no *forgiveness* of indebtedness in either case, although there is a change in the mortgagor's balance sheet or net worth. He no longer has the liability to account for, nor does he have the assets. * * * We believe the holdings of *Crane* and subsequent cases decided in the light of *Crane* mandate the conclusion that *relief* from indebtedness, even though there is no personal liability, is sufficient to support a sale or exchange. See *Simon v. Commissioner*, 32 T.C. 935 (1959), affd. 285 F.2d 422 (3d Cir. 1960); *Johnson v. Commissioner*, 59 T.C. 791 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974); *First National Industries, Inc. v. Commissioner*, 404 F.2d 1182 (6th Cir. 1968), cert. denied 394 U.S. 1014 (1969).

---

[12]We address this issue not in an effort to determine the character of petitioner's gain (ordinary income versus capital gain), since respondent treats the income as capital gain and petitioner does not dispute such treatment, but rather we ask whether petitioner's charitable gift of the properties was a "sale or exchange" for purposes of deciding whether to calculate the amount of petitioner's gain using his adjusted basis in the properties as determined under sec. 1011(a) or 1011(b).

As applied to the present facts, we are convinced that petitioner's charitable contribution of the properties must also be treated as a sale or exchange.[13] See sec. 1.1011–2(a)(3), Income Tax Regs. Cf. sec. 357(c) (requires certain exchanges under sections 351 and 361 to be treated as sales or exchanges when, inter alia, the amount of the liabilities to which the exchanged property is subject exceeds the adjusted basis of the property). .

Thus far we have held that petitioner made either a sale or exchange of the properties to the temple, and that his gain equaled the amount by which the mortgages exceed his adjusted bases in the properties on the date of transfer. To the extent that the fair market value of the properties exceeds the mortgages (the amount of which is determined in the next section of this opinion), petitioner is entitled to a charitable deduction under section 170. Petitioner's bases for determining gain are calculated under section 1011(b),[14] which provides:

If a deduction is allowable under section 170 (relating to charitable contributions) by reason of a sale, then the adjusted basis for determining the gain from such sale shall be that portion of the adjusted basis which bears the same ratio to the adjusted basis as the amount realized bears to the fair market value of the property.

The regulations properly apply section 1011(b) to both sales and exchanges and not merely to sales despite the sole use of that word in the statute. Sec. 1.1011–2(a)(1), Income Tax Regs.[15] Furthermore, section 1.1011–2(a)(3), Income Tax Regs., specifically provides:

(3) If property is transferred subject to an indebtedness, the amount of the indebtedness must be treated as an amount realized for purposes of determining whether there is a sale or exchange to which section 1011(b) and this section apply, even though the transferee does not agree to assume or pay the indebtedness.

We find that petitioner's adjusted bases for calculating his gain under section 1001(a) should be determined under section 1011(b), and his gain is equal to the difference between the

---

[13]In *Johnson v. Commissioner, supra,* the Sixth Circuit in affirming our decision had little problem holding that the taxpayer's gift was a "sale or exchange." See note 10 *supra.*

[14]See note 12 *supra.*

[15]The regulations under sec. 1011(b) were adopted on Oct. 3, 1972, but are applicable to bargain sales or exchanges made after Dec. 19, 1969.

outstanding mortgages and that portion of his adjusted bases which bears the same ratio to the adjusted bases as the amount of the mortgages bears to the fair market value of the properties.

Finally, petitioner must recognize in 1970 the entire amount of his gain. Sec. 1002.[16]

The fourth and final issue for our determination is the amount, if any, petitioner is entitled to deduct in 1970 as a charitable contribution. Respondent argues that petitioner is entitled to a deduction equal to the $5,000 realized by the temple from the sale of the properties.[17] Petitioner, on the other hand, argues that he is entitled to a $143,304 deduction based on his expert's opinion of the value of the properties at the time of the contribution. We disagree with both petitioner and respondent and find that petitioner is entitled to a charitable contribution deduction of $30,000 in 1970.

Petitioner has the burden of proving the amount of charitable contribution he may deduct. *Lamphere v. Commissioner*, 70 T.C. 391 (1978); Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioner failed to take a charitable contribution on either his 1969 or 1970 income tax return. Petitioner testified that he did not take such a deduction because of the difficulty in valuing the properties. Petitioner's testimony in this regard is questionable since he left all of his business and tax work to his accountants and attorneys and relied upon them to properly report his income. We do not know why they failed to report his charitable contributions.

Petitioner's expert witness, Henry C. Entreken, Jr., is a qualified real estate appraiser and mortgage banker. Entreken was hired by petitioner to render an opinion on the value of the properties on December 31, 1969.[18] In valuing the leases, Entreken made the following assumptions:

---

[16]Sec. 1002 is currently sec. 1001(c).

[17]The Kallman group paid the temple $5,000 for the Aberdeen Properties, and assumed the mortgages on the properties and paid the State transfer taxes. Hecht took the Sandringham Properties subject to the mortgages and paid the State transfer taxes ($25,000), but paid nothing to the temple.

[18]One of Entreken's reports puts the date of valuation as Dec. 31, 1979. It is clear from the report, however, that Entreken's valuation date was Dec. 31, 1969.

1. The lessees would extend the terms of all leases for all periods covered under renewal options.

2. A discount rate of eight percent was applied to all expected future cash flows (the eight percent was arrived at based on an average of mortgage rate indicators for 1969).

3. Annual net cash flow to the lessor from the Sandringham Properties during the primary term of the applicable leases was $1,838. Annual net cash flow to the lessor from the Aberdeen Properties during the primary term of the applicable leases was $792.

4. All mortgages encumbering the Properties would be completely liquidated at the end of the primary term of the applicable leases.

5. The estimated value of the reversionary interest in the Properties at the expiration of all renewal periods was one-half the value of the original cost—a figure which purportedly takes into consideration inflation during the leasehold period.

6. The leases were "absolute net leases" and all expenses connected with the Properties were the responsibility of the lessees.

7. The lessees were corporations of national credit status.

8. A person purchasing the Properties in 1969 would have assumed that the leases would not be cancelled despite the existence of certain provisions pursuant to which the leases could be cancelled.

Starting with these assumptions, Entreken determined that the present value (on Dec. 31, 1969) of the expected future stream of income from the properties plus the present value of the reversionary interest was as follows:

| | |
|---|---|
| Sandringham Properties | $135,500 |
| Aberdeen Properties | 95,000 |
| Total | 230,500 |

Entreken adjusted these figures to account for the fact that Mrs. Guest did not join in the execution of the deeds and under Pennsylvania law possessed inchoate dower rights. His adjusted figures were:

| | |
|---|---|
| Sandringham Properties | $101,500 |
| Aberdeen Properties | 89,110 |
| Total | 190,610 |

Entreken was asked to make his calculations about 3 weeks before trial. Entreken's review of documents and preparation of reports took approximately 6 hours, despite the fact that Entreken claimed to have reviewed over 950 pages of materials (a large part of which, however, was repetitious). Entreken did not physically inspect any of the properties, he did not

prepare a narrative report, and he did not talk with any of the tenants of the properties. Entreken did not notice, nor take into account, the balloon payment due at the end of the mortgage term which required the owner of the Aberdeen Properties to pay 5 percent of the original balance of the mortgage at maturity. In addition, Entreken overlooked the "kicker payment" required by the mortgages on the Aberdeen Properties. The "kicker" required the owner to pay 20 percent of the original balance of the mortgage to the mortgagee at maturity, or, if the payment was not forthcoming, grant the mortgagee the equivalent of an undivided half interest in the property. During cross-examination, Entreken adjusted his valuation of the Aberdeen Properties from $89,110 to $41,272 to reflect these oversights.

Entreken admitted on cross-examination that some of the provisions of the leases involved legal questions which exceeded his field of expertise. Entreken testified that offers to purchase and the purchase options in the leases served two functions. First, they acted as a "walking price," that is, the lessee could offer to purchase the underlying property and if the offer was refused the lessee could walk away from the leases. Second, they acted as an option to purchase, but Entreken believed that if the option price accurately represented the values of the properties, the lessees would have purchased them. Finally, under Entreken's interpretation of the options, the lessor could always refuse to sell to the lessee merely by paying off the mortgage and thus protect a valuable piece of property.

Entreken's final figures for the valuation of the properties on December 31, 1969, were:

| | |
|---|---|
| Sandringham Properties ................ [19] | $102,032 |
| Aberdeen Properties .......................... | 41,272 |
| Total ......................................... | 143,304 |

None of Entreken's December 31, 1969, valuations made any adjustment for the high State transfer taxes applicable to some of the properties.

Section 1.170A–1(c)(1), Income Tax Regs., provides that the

---

[19]Entreken did not explain how this figure was increased from his previous figures.

amount of a charitable contribution of property other than money is the fair market value of the property at the time of the contribution subject to certain reductions not applicable here. Section 1.170A–1(c)(2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts."

Respondent argues that petitioner has failed to establish any value for the properties on December 31, 1969, in excess of the $5,000 paid by the Kallman group to the temple for the Aberdeen Properties. Apparently, respondent attributes no value to the contribution of the Sandringham Properties.

As we recently stated in *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 451 (1980), issues of valuation such as that facing us presently are "more properly suited for the give and take of the settlement process than adjudication." The value of the properties even under petitioner's expert witness' present value approach must be less than $143,304 because he admitted that the calculation omitted any consideration of the transfer taxes. No tax aspects of the ownership of the properties were examined, and those aspects could arguably add to, or subtract from, the value of the properties. Entreken made no effort to determine the value of the properties, unencumbered by any mortgages, on December 31, 1969. Finally, Entreken admitted that the leases in question left many unanswered legal questions, particularly dealing with the lessor's right not to sell if the lessee exercised his purchase option. Entreken's calculations, however, make no allowance for any of those potential problems.

Respondent's position is also unpersuasive. The fact that Hecht sold the Aberdeen Properties for $5,000 and personally retained the Sandringham Properties without making any payment to the temple raises some question whether the $5,000 represents a fair price. Hecht allegedly offered to sell the Aberdeen Properties to approximately 10 people. See *Estate of DeBie v. Commissioner*, 56 T.C. 876, 894–895 (1971). However, Hecht could not recall the names of any persons he approached regarding the possible purchase of the Aberdeen Properties except for Kallman—the eventual purchaser. Furthermore, Hecht testified that he did not believe the Sandring-

ham Properties had any value on December 31, 1969, when he agreed to take on the burden of their ownership. Hecht testified that although he did receive the Sandringham Properties without any consideration passing to the temple, he did so only after complete disclosure to the members of the finance committee. He also testified that the transfer took place only after numerous futile attempts to locate a purchaser. Hecht then stated, "And so rather than give it [the Sandringham Properties] away to somebody as a gift, I decided rather to take that burden upon myself." Subsequent to the time Hecht acquired the Sandringham Properties, he has received almost $30,000 from them, although some of that amount was attributable to disputes with Singer resulting in sales of parcels of the Sandringham Properties to Singer.

Considering all the facts presented to us, we conclude that the fair market value of the properties, net of the various encumbrances, at the time of their transfer to the temple was $30,000.

*Decision will be entered under Rule 155.*

Reviewed by the Court.