RICHARD B. SKALA and KATHARINE J. SKALA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Skala v. Commissioner
Docket Nos. 9300-80, 27901-82.
United States Tax Court
T.C. Memo 1985-1; 1985 Tax Ct. Memo LEXIS 627; 49 T.C.M. (CCH) 419; T.C.M. (RIA) 85001; January 2, 1985. *627 Held, fair market value of an aircraft contributed to charity determined. Held, further, Ps are liable for the addition to tax under sec. 6651(a), I.R.C. 1954, for failure to timely file their tax returns for 1976 and 1977. Steven G. Rothenberg, for the petitioners. Bradford A. Johnson, for the respondent. SIMPSON MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Addition to Tax
Sec. 6651(a)(1)
Year
Deficiency
I.R.C. 1954 [1]
1976
$4,025.01
$547.87
1977
10,750.95
1,289.50
1978
3,969.00
1979
6,303.00
*630 After concessions by the parties, the issues for decision are: (1) The fair market value of an aircraft donated by the petitioners to a museum, and (2) whether the petitioners are liable for an addition to tax under section 6651(a) for 1976 and 1977 for failure to timely file their Federal income tax returns. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Richard and Katherine Skala, husband and wife, maintained their residence in Lake Katrine, N.Y., at the time the petitions in these consolidated cases were filed. They filed their joint Federal income tax returns for 1976 through 1979 with the Internal Revenue Service Center, Andover, Mass. Their return for 1976 was filed on April 2, 1979, and their return for 1977 was filed on April 18, 1979. Mr. Skala will sometimes be referred to as the petitioner. In November 1975, the petitioner, an airline pilot, purchased a Sealand S.A. 6 aircraft, serial number 1571, registration SU-AHY, from the Saudi Arabian Air Force for $3,000. The price was not *631 the subject of negotiation; the petitioner merely wrote to the Air Force base commander at Jiddah, Saudi Arabia, asking whether and at what price the aircraft could be purchased. The base commander responded with the price of 10,000 riyals ($3,000), the petitioner accepted, and the sale was completed. The aircraft was manufactured by the well known and well regarded firm of Short Brothers & Harland, Ltd. (Short Brothers), in Belfast, Northern Ireland. Only 25 Sealand S.A. 6 aircraft were manufactured by Short Brothers, and of the 25, only 2 are believed to be in existence today: the aircraft in question and another in a museum in Yugoslavia. The Sealand S.A. 6 is a twin-engined, all-metal amphibian aircraft; that is, it can take off and land on both land and water. The Sealand S.A. 6 in question was originally equipped as a luxurious air-yacht and sold by Short Brothers to the director of the Khedivial Mail Line in Egypt. Subsequently, the aircraft was given to King Ibn-Saud. It is believed that King Ibn-Saud never flew in the plane. The aircraft was turned over to the Saudi Arabian Air Force, but was flown very little. The aircraft sat in the desert in Saudi Arabia, *632 completely out of use, for approximately 15 years before the petitioner purchased it in 1975. Altogether, the aircraft may have been flown a total of 250 to 300 hours. However, this figure cannot be verified because the plane's flight log books were misplaced or discarded by the Saudis. The petitioner spent $6,000 to transport the aircraft from Saudi Arabia to New York. He acquired the plane with the intention of restoring it for his personal use. However, until a deregistration certificate was obtained from the Saudi government, something which has not yet been done, the U.S. Federal Aviation Administration would not issue a certificate of airworthiness allowing the plane to be flown. Upon its arrival in New York, the petitioner arranged to have the aircraft delivered to the Nassau County Board of Cooperative Educational Services (BOCES), in Hicksville, N.Y., where an instructor of aviation mechanics, Anthony Murello, had agreed to have his students carry out the restoration work if the petitioner provided the necessary materials and equipment. The aircraft was extensively examined by Mr. Murello upon its arrival at the school. Over the next year, the craft's flight instruments, *633 portions of its wooden floor, and its passenger cabin appointments were removed in preparation for restoration. Some restoration work was done, consisting of the removal of surface oxidation and corrosion from the fuselage. In 1977, the petitioner decided to donate the aircraft to a museum when Mr. Murello informed him that restoration to flying condition, although possible, would be prohibitively expensive. To restore the craft to flying condition would have cost from $120,000 to $150,000 in 1977; to restore it for static display in a museum would have cost about $50,000. The petitioner made no attempt to sell the aircraft. On December 19, 1977, he made an unrestricted gift of the aircraft to the Connecticut Aeronautical Historical Association, Inc. (CAHA), located at its Bradley Air Museum (the museum) in Windsor Locks, Conn. CAHA qualifies as an exempt organization within the meaning of section 501(c)(3). At the time of the aircraft's donation, the landing gear and 40 percent of the panels on the bottom hull were heavily corroded and needed replacement, the flight instruments needed repair or replacement, the engines were rusted and required a complete overhaul, *634 the pans on the bottom of the engines were corroded through, parts of the aircraft's wooden floor had been removed, some of the structure and cables within the wings were mildly corroded, the windows and passenger cabin appointments needed replacement, and some wiring had to be replaced or repaired. Since its delivery to the museum, the aircraft has been stored outdoors, unprotected from the weather. Its condition has severely deteriorated due to vandalism and its exposure to the elements. The petitioners have a cost basis in the aircraft of $9,000. The aircraft was "capital gain property" within the meaning of section 170(b)(1)(C)(iv). On their 1977 joint Federal income tax return, the petitioners claimed a charitable contribution deduction with respect to this donation of the Sealand S.A. 6 aircraft to CAHA. They listed the fair market value of the aircraft as of the date of the gift as $145,000.00 and deducted $21,297.62 in 1977, 50 percent of their gross income less $728.18 of other charitable contributions. The petitioners carried the unused portion of the charitable deduction over to their 1978 and 1979 returns. The Commissioner disallowed the entire deductions *635 attributable to the gift of the aircraft in all those years. He also determined an addition to tax under section 6651(a) for 1976 and 1977 because the petitioners' returns for those years were delinquently filed. OPINION The first issue for decision is the fair market value on December 19, 1977, of the aircraft donated by the petitioners to CAHA. Section 170(a)(1) allows a deduction for any charitable contribution made in the table year. If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution. [2]Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; see United States v. Cartwright,411 U.S. 546 (1973). *636 The determination of the aircraft's fair market value is a question of fact to be resolved from a consideration of all relevant evidence in the record. See Mathias v. Commissioner,50 T.C. 994, 997 (1968); McGuire v. Commissioner,44 T.C. 801, 807 (1965). The petitioners have the burden of proving the fair market value of the aircraft. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). At trial, the petitioners abandoned their claim that the aircraft had a fair market value of $145,000; instead, they relied upon a valuation of $90,000 supplied by their expert witness, Harvey H. Lippincott. Likewise, the Commissioner no longer contends that the plane had no value; he maintains that the aircraft's fair market value was $3,000, its cost to the petitioner, or alternatively, that the aircraft was worth $18,000, the value placed upon it by the Commissioner's expert, Edgar A. Jurist. While cost can be "cogent evidence of value" ( Tripp v. Commissioner,337 F.2d 432, 434 (7th Cir. 1964), *637 affg. a Memorandum Opinion of this Court), several additional factors convince us that the aircraft's fair market value on December 19, 1977, exceeded its cost to the petitioner. First, we have found that the $3,000 price paid by the petitioner to the Saudi Arabian Air Force was not arrived at through arm's length negotiation. The Saudi Arabian Air Force, having received the plane as a gift, had little use for an amphibian aircraft in a desert climate and abandoned the plane 15 years before its sale to the petitioner. The petitioner, who is not in the business of buying or selling aircraft and who did not secure an expert appraisal of the plane's value before purchasing it, agreed to the first and only price given by the Saudis. These circumstances surrounding the aircraft's purchase suggest that its cost to the petitioner may not have been its fair market value in 1975, let alone in 1977. Furthermore, there is evidence that the aircraft's value increased in the time between its purchase and its donation to CAHA. The petitioner, at a cost of $6,000 and much personal effort, transported the aircraft from the desert of Saudi Arabia to New York, making it more readily *638 available to potential purchasers. Also, after the aircraft's delivery to the Nassau County BOCES, Mr. Murello and his students inspected the aircraft, removed parts in need of repair or replacement, and commenced restoration work by removing oxidation from the fuselage. Finally, the Commissioner's own expert valued the plane in December 1977 at $18,000 rather than at the $3,000 that the petitioner paid for it in 1975. Although the petitioners' expert witness, Mr. Lippincott, and the Commissioner's expert witness, Mr. Jurist, were essentially in agreement as to the aircraft's actual physical condition on December 19, 1977, they came to vastly different conclusions as to its fair market value. After a careful examination of their written appraisals and testimony, we conclude that the $90,000 value placed on the aircraft by Mr. Lippincott must be disregarded because his appraisal gave undue weight to certain facts about the aircraft which add little to its value in the actual marketplace for aircraft. This misplaced emphasis is a result of Mr. Lippincott's inexperience as an appraiser for buyers and sellers of vintage aircraft. Mr. Lippincott is an avid airplane buff; in 1959, *639 he was instrumental in founding CAHA, and, later, in forming its Bradley Air Museum. He served as the president of CAHA for 7 years and then as voluntary director of the museum for 8 years. He has a deep personal interest in the growth and success of the museum. At this time he examined the aircraft in 1978, he was a member of the museum's accessions committee, the body responsible for examining, appraising, and accepting donations to the museum's collection. However, Mr. Lippincott does not appraise aircraft on a regular basis. He has been employed full-time by the United Technologies Corporation and is currently that corporation's archivist and historian. Mr. Lippincott's experience as an appraiser consists primarily of having valued 50 or 60 aircraft donated to the Bradley Air Museum. Recently, he has begun appraising aircraft for individuals, but only if the aircraft is being donated to a museum. He is not a member of any professional appraisal societies. It is most significant that Mr. Lippincott has himself bought only two aircraft--a balloon and a World War II Italian fighter--both of which he donated to the Bradley Air Museum, and that he has never sold an aircraft *640 nor acted as a broker in the sale of one. In short, Mr. Lippincott has no actual experience in the marketplace for vintage aircraft. In contrast, the Commissioner's expert, Mr. Jurist, has been employed full-time in the business of collecting, restoring, buying, selling, and appraising rare aircraft and automobiles all over the world for more than 15 years; he employs six people to assist him in this business; he has bought and sold more than 50 vintage aircraft; and he is currently a member of eight societies associated with either the history or appraisal of aircraft. In summary, Mr. Jurist's livelihood depends upon his ability to accurately determine the fair market value of aircraft. Mr. Lippincott's approach to the valuation of the aircraft involved here reflects his inexperience in the marketplace. He purported to value the plane at the price at which it would change hands between a willing buyer and a willing seller, but he also conceived the imaginary buyer to be an "airplane collector, the type of person who has enough financial resources to buy a unique airplane and restore it and fly it generally for pleasure." Viewing the potential buyer as a wealthy collector, *641 Mr. Lippincott felt that the aircraft's value was enhanced by its rarity (this aircraft being one of the two known survivors of the 25 originally manufactured) and its historical association with King Ibn-Saud. From his experience at the Bradley Air Museum, Mr. Lippincott had found that these factors could be a draw to museum visitors. In fact, he also factored in the aircraft's "museum" value for technical comparison purposes; as an amphibian aircraft manufactured by a well known producer of such craft, it had a place in an aircraft collection where it could be compared by a viewer to other such amphibian aircraft. Although he testified that he considered the plane's potential airworthiness to be an important factor in his valuation, it is striking that he considered the aircraft--which is not currently flyable, and which can be made airworthy only at a cost of from $120,000 to $150,000--to be in "good" condition. Overall, Mr. Lippincott's appraisal reflects his experience as a museum director, but it does not reflect an awareness of the factors relevant in the market for vintage aircraft. Mr. Jurist's appraisal, on the other hand, reflects his years of experience *642 in the purchase, sale, and restoration of aircraft. According to Mr. Jurist, very few individuals own extensive aircraft collections because of the great investment of time and money required. Most purchasers of aircraft, even vintage aircraft, are seeking an airplane which can be flown. Consequently, an airplane is more valuable the closer it is to its original cosmetic and flying condition. In Mr. Jurist's opinion, the aircraft's rarity alone will not add much to its value; only when the virtues of "technical excellence, beauty of design and eye appeal, [and] function of the aircraft" are added to rarity will a plane have "inestimable market value." Furthermore, although some famous planes do have great value as collector's items even if they cannot fly, the Sealand S.A. 6 was not such an aircraft; it had no historical value despite the fact that it had been owned by King Ibn-Saud because there was no evidence that it had ever been used by the King; it was not technically innovative; it was not known for its exploits in some historical event, such as a war; in fact, as Mr. Lippincott agreed, a Grumman Wigen or Goose is a much better example of an amphibian aircraft *643 and would be of greater interest to a museum. Mr. Jurist described the aircraft's cosmetic condition as only "poor to fair" in 1977. The fact that the aircraft had not been deregistered by the Saudi Arabian government would also significantly affect its value because, until it was deregistered, the Federal Aviation Administration would not issue a certificate of airworthiness allowing the plane to be flown. He concluded that the fair market value of the aircraft--in poor to fair cosmetic condition and not flying--was $18,000 in 1977. Even if the aircraft were airworthy, restored to cosmetic perfection, and fully certified in 1977, its fair market value would not have exceeded $50,000. Because we find that Mr. Jurist's appraisal more accurately reflects the facts and circumstances relevant in the marketplace for vintage aircraft, we find that the fair market value of the aircraft was $18,000 in 1977. [3] The petitioners concede that the aircraft was "capital gain property" within the meaning of section 170(b)(1)(C)(iv) and, consequently, that their deduction in 1977 is limited to 30 percent of their adjusted gross income in such year. Sec. 170(b)(1)(C)(i), (b)(1)(E) *644 and (F). If a portion of their contribution is not deductible in 1977 because of the 30-percent limitation, it may be carried over to 1978. Sec. 170(b)(1)(C)(ii). The *645 second issue for decision is whether the petitioners are liable for additions to tax under section 6651(a)(1) for failure to timely file their tax returns for 1976 and 1977. Section 6072(a) requires returns made on the basis of the calendar year to be filed on or before the 15th day of April following the close of the calendar year. Section 6651(a) imposes an addition to tax on a taxpayer who fails to file a timely return unless it is shown that such failure was due to reasonable cause and not due to willful neglect. The petitioners bear the burden of proving that the addition to tax does not apply. Rule 142(a); Ehrlich v. Commissioner,31 T.C. 536, 540 (1958). The petitioners' Federal income tax return for 1976 was filed on April 2, 1979, and their return for 1977 was filed on April 18, 1979. The petitioners have neither presented any evidence nor argued that their failure to timely file their returns was due to reasonable cause. Accordingly, the petitioners are liable for the addition to tax for such years. Decision will be entered under Rule 155. *646 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. Neither party has contended that the property donated here is subject to sec. 170(e)(1)↩, limiting the deduction for contributions of certain types of property.
3. Although in the present case we have adopted Mr. Jurist's valuation of the aircraft rather than, for example, determining that its value lies somewhere between the two figures provided by the expert witnesses, we do not mean to imply to either party that we have abandoned our traditional position that valuation is a question of fact. See Guest v. Commissioner,77 T.C. 9, 26-30 (1981); Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 276 (1979); Mathias v. Commissioner,50 T.C. 994, 997 (1968); McGuire v. Commissioner,44 T.C. 801, 807 (1965). Contrary to the Commissioner's assertion on brief, this Court has not taken the position that we will "reach a decision which adopts one party's position as against the other" in valuation cases; in Buffalo Tool and Die Mfg. Co. v. Commissioner,74 T.C. 441 (1980), and T.C. Memo. 1981-457↩, we expressed some approval for such approach, but we did not adopt it.