LEO G. EBBEN AND DONNA W. EBBEN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ebben v. Commissioner
Docket Nos. 8473-77, 7158-78, 2765-80, 13766-80, 18516-80, 1838-81.
United States Tax Court
T.C. Memo 1983-200; 1983 Tax Ct. Memo LEXIS 594; 45 T.C.M. (CCH) 1283; T.C.M. (RIA) 83200; April 11, 1983; As Amended May 11, 1983 *594 Held: the fair market value of real property subject to a nonrecourse indebtedness which a partnership contributed to a charitable organization in 1973 determined. Held further: the gift of the real property to the charity is a sale to the extent that the transfer was subject to the nonrecourse indebtedness and the partnership's adjusted basis for measuring gain on the bargain sale of the real property is to be determined under section 1011(b). Guest v. Commissioner,77 T.C. 9 (1981), followed. Douglas W. Argue and Jeffrey Berkowitz, for the petitioners. Karl D. Zefelt, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated cases respondent determined the following deficiencies in petitioners' Federal income taxes: Addition
Income Tax
to tax
Docket No.
Petitioners
Year
Deficiency
[2] Sec. 6651(a)(1) 8473-77
Leo G. Ebben and
1973
$6,217.00
$933.00
Donna W. Ebben
7158-78
Gilbert Dreyfuss and
1974
4,863.00
Evelyn H. Dreyfuss
2765-80
Donald Kaufman and
1970
870.55
Gloria Kaufman
1973
9,850.00
13766-80
Eli Broad and
1973
248,150.00
Edythe L. Broad
1974
87,977.00
1975
7,742.00
1976
28,578.00
18516-80
Donald Kaufman and
1975
21,045.00
Gloria Kaufman
18308-81
Eli Broad and
1977
52,816.00
Edythe L. Broad
*595 In an amended answer, respondent has alleged that the deficiency in petitioners Leo G. Ebben and Donna W. Ebben's (docket No. 8473-77) Federal income tax for the year 1973 is $12,160.78. After concessions, [3] the issues are (1) what was the fair market value as of December 28, 1973, of a parcel of real property donated by Whitney Farms Investment Co. (herein Whitney Farms) to Pitzer College (herein Pitzer) and (2) if the fair market value of the parcel exceeds Whitney Farms' basis in the parcel, whether Whitney Farms realized a capital gain upon the transfer of the parcel. FINDINGS OF FACT Some of the facts in these cases were stipulated. The *596 stipulation of facts, [4] supplemental stipulation of facts, second supplemental stipulation of facts, and stipulated exhibits are incorporated herein by this reference. All petitioners resided in California at the time of filing their respective petitions herein. On or about December 26, 1968, petitioners Donald B. Kaufman (herein Kaufman) and Eli Broad (herein Broad) purchased a parcel of unimproved real property (herein sometimes referred to as the subject property) from a trust known as the Sixty Trust for $548,000. Kaufman and Broad gave the Sixty Trust a note in the amount of $544,584, secured by a trust deed on the property, as part of the property's purchase price. On or about January 1, 1969, Whitney Farms, a general partnership, was formed. Whitney Farms was composed of petitioners [5] *597 and others, whose respective interests were as follows: Eli Broad
63.0%
Donald Kaufman
27.0%
Leo Ebben
3.5%
Gilbert Dreyfuss
3.0%
Others
3.5% On or about January 1, 1969, Kaufman and Broad each transferred his respective interest in the subject property, subject to the trust deed, to Whitney Farms as a contribution of capital. On that same date, Kaufman and Broad also transferred two other parcels acquired by them on or about December 26, 1968, to Whitney Farms. Whitney Farms' purpose, as set forth in its Agreement of General Partnership, was to hold property of the partnership for investment purposes. The subject property is located in Placer County, California, between the communities of Roseville and Lincoln. [6] *598 It is 931.66 acres: 322.63 acres of the property are located on the west side of Fiddyment Road and the remainder (609.03 acres) is located east of said road. We will hereinafter refer to the portion lying east of Fiddyment Road as the east tract and the remainder as the west tract. As of December 28, 1973, the northeast "arm" of the subject property, comprising approximately 75 acres, was zoned "M" (Industrial) and "M-D" (Industrial with Design Control). The remainder of the subject property was zoned "U" (Unclassified). The U zoning classification is a transitional or holding zone, which will generally be changed to the zoning of the nearest property. Land zoned U may be used for most residential and agricultural purposes. Industrial use is not permitted on land zoned U. The subject property had no water and sanitary sewage services in 1973. The nearest water and sewer lines were located approximately 4,000 feet east of the most northeasterly part of the property and approximately 1,200 feet from the southeast portion of the property. Although Fiddyment Road and Sunset Boulevard West, which borders the west tract on its north side, provide access to the subject property, these roads *599 needed to be improved to be adequate for industrial use. On December 5, 1973, pursuant to a request of Roland Sutton (herein Sutton), the then Director of Industrial Development for Placer County, an engineering firm submitted a written proposal for preparation of a basic development plan for the Sunset/Whitney Industrial Area. In May 1974 the county entered an agreement with the engineering firm for preparation of such a plan, whereby the engineering firm agreed to (1) "perform an in-depth study of the suggested Core Area as shown on Exhibit "A" [attached to the agreement] to determine the proper location of future roadways and utilities" and (2) "to determine the extent to which future expansion of the Core Area would result in probable development of the peripheral area, and to determine the logical form such development should take." No part of the subject property was in the so-called "Core Area." The 75 acres zoned M and M-D were in the peripheral area and the remainder of the subject property was adjacent to the peripheral area. In January 1975 the engineering firm submitted its report to Placer County. The conclusions of the report were accepted by the Board of Supervisors *600 of Placer County and were used by the county staff in making various decisions. The report proposed several new roadways, sewerlines, and waterlines. There were no proposals contained therein to extend any of the waterlines or sewerlines to the subject property. Under the subject heading "Zoning", the report states: The Basic Plan of Development considers the adjacent county areas zoned "F-B-X" and "U" east of Fiddyment Road as logical future expansions of the present industrial district. These areas represent approximately 1,200 additional acres for potential industrial usage. Since the zoning process can be time-consuming and often requires an amendment to the General Plan, it would be prudent to review this matter as a trend of development occurs within the present industrial district. According to a map included in the report, the 534.03 acres of the east tract zoned U (609.03, total acres in east tract, less 75 acres zoned M or M-D) are part of the adjacent county areas zoned U east of Fiddyment Road referred to in the above quote. On December 28, 1973, Whitney Farms contributed the subject property to Pitzer, a qualified charitable organization under section 170. The contribution *601 was made subject to the trust deed, which secured an outstanding obligation in the amount of $544,584 as of the date of the contribution. In preparation for the filing of Whitney Farms' 1973 information return, petitioner Leo G. Ebben (herein Ebben), the managing partner of Whitney Farms, employed Donald L. Vogel (herein Vogel) and Peter F. Brennan (herein Brennan), qualified expert appraisers, to value the subject property. Vogel and Brennan submitted an appraisal report to Ebben on April 10, 1974. They used a market data approach and estimated a per acre value of $2,000 for the east tract and a per acre value of $650 for the west tract. Thus, they concluded that the subject property's fair market value as of December 28, 1973, was $1,420,000. [7] *602 Whitney Farms, consequently, reported the contribution of the subject property on its 1973 information return as follows: Appraised Value at Date of Gift
$1,420,000
Less: Deed of Trust
-544,584
Total
$ 875,416
In 1978, petitioners employed Thomas W. Clark, Jr. (herein Clark), to appraise the subject property. Clark used the market data approach and considered the east tract to have a greater potential than the west tract for near term industrial development. He concluded a per acre value for the east tract of $1,500 and a per acre value for the west tract of $650, resulting in a total value of $1,117,000 for the subject property. [8]
Respondent employed Francis L. Blaesi (herein Blaesi), an expert appraiser, to estimate the fair market value of the subject property. Bleasi determined that, relative to the December 28, 1973, valuation date, the approximately 75 acres of the subject property zoned M and M-D would have been considered to have industrial potential and that the remainder should be evaluated as agricultural property. He determined that the subject property's fair market value as of December 28, *603 1973, was $569,000: $1,000 per acre for the 75 acres zoned M and M-D and $600 per acre for the acreage zoned U. [9] Table 1 below sets forth sales of certain agricultural properties in the vicinity of the subject property during the period from February 25, 1972, to June 17, 1975: Table 1
Sale
Total
Price Per
Parcel
Date
Grantor
Grantee
Acreage
Acre
Zoning
1
7-6-73
Dowd et al.
Bair et al.
160   $625
FBX-20
2
6-17-75
Carlson (or
Moore
301.29
498
FBX-80
Carlsori)
3
8-25-72
Goodfellow
Lanza de
1,228.25
[10] 611
U
Las Americas
4
2-25-72
Riley
Strangeland
116.37
816
U
Blaesi and Clark each considered the sales of Parcels No. 1 and 2 in appraising the portion of the subject property that each determined had a highest and best use as agricultural land. Parcel No. 1 is contiguous to the subject property to the south and is east of Fiddyment Road. It has frontage on Fiddyment Road. Parcel No. 2 lies to the west of Fiddyment Road and has frontage on the road. Both parcels were unimproved at the *604 time of sale. Parcel No. 3 was considered by Brennan and Vogel and by Blaesi in estimating the fair market value of the portions of the subject property that they concluded had a highest and best use as agricultural land. It lies to the east of Fiddyment Road, on which it has frontage, and to the north of the subject property. Improvements located on Parcel No. 3 include three houses, two barns, sheds, and fencing. On its sale date, Parcel No. 4 had extensive improvements, including a two-story house in good condition. Blaesi included the sale of Parcel No. 4 in his appraisal report as his Sale No. 10. He placed no reliance on such sale, however, in estimating the fair market value of the agricultural portion of the subject property since, in his opinion, the subject property, which had no buildings, "is definitely less valuable per acre." "Comparable" sale 7 of Clark's report was of property adjacent to the northeast arm of the subject property, which sold for either $727.01 or $800 per acre [11] on July 30, 1974. Although the property was zoned M-DC (Industrial, Design Control) and was in the area studied in the aforementioned engineering report, Clark considered it to be agricultural *605 property, because he thought it had no access. He, therefore, used it as a comparable in evaluating the agricultural portion of the subject property. In fact, the County of Placer owned an assessor's parcel that extended 940 feet from Placer Boulevard to the southeast corner of the property. Thus, access could be secured by any purchaser willing to pay to have 940 feet of road paved. Furthermore, in the engineering report whose conclusions were accepted by the Board of Supervisors of Placer County, there was a proposal to extend Placer Boulevard due west along the south side of this property. Table 2 sets forth the date of sale, grantor, grantee, size, price per acre, and zoning of seven pieces of property in the vicinity of the property contributed by petitioners to Pitzer: Talbe 2
Sale
Parcel
Date
Grantor
Grantee
A
[12] 7/69
Sunset Industrial
Whitney Industrial
Properties, Inc.
Park, Ltd.
B
1/73
Golf Freeway
American Olean
Junction Properties
Tile Co.
C
7/73
Lincoln Investment
Western Electric Co.
D
11/69
Diamond Oaks
Carlsberg Financial
Freeway Properties
Corp.
E
12/72
L.C. Farm Co. #1
J.S.J. Company
F
4/70
K & D Company
Davis Financial
Corp.
G
8/73
Continental Capital
Fiberboard
Corporation
Corporation
*606 Total
Price Per
Parcel
Acreage
Acre
Zoning
A
884
$1,725.11
M-DC
B
60
3,000.00
[13]
C
[14] *607 [14]
[14]
D
338
2,289.94
A
(Acricultural)
E
640
1,800.00
RIA &A
(Residential and
Agricultural)
F
210.5
1,187.65
Agricultural
G
165.6
1,992.75
M-2
(Heavy
industrial,
by the City of
Rocklin) Parcel A is located adjacent to the subject property to the north and to the east of Fiddyment Road. It has frontage on Athens Road and the Southern Pacific Railroad. Sunset Industrial Properties had purchased the parcel for somewhat less than $1,300 per acre in November 1968. The evidence before us does not indicate why Whitney Industrial Park, Ltd. paid $1,725.11 per acre for land which had sold for somewhat less than $1,300 per acre 8 months earlier. The July 1969 sale of Parcel A was relied on by Brennan and Vogel and by Clark in estimating the fair market value of the east tract. Whitney Industrial Park, Ltd. paid $35,000 in cash for Parcel A and took the property subject to an all-inclusive deed of trust securing an indebtedness of $1,490,000. Whitney Industrial Park, Ltd. also prepaid $156,450 in interest and paid $28,550 into a reserve *608 for taxes pursuant to this purchase. Parcels B and C were vacant when they were purchased. Both parcels had locations and access superior to the subject property and were nearer to rail and utilities. Carlsberg Financial Group, which owns and/or controls a significant amount of acreage in the vicinity of the subject property, controlled the grantors of Parcels B and C as of their sale dates. Both parcels were purchased for construction of new industrial plants. Parcels D, E, and F were located in residential neighborhoods and at the time of sale, were suitable for residential development, not industrial use. Clark selected the sales of these parcels as comparables for purposes of evaluating the east tract. Parcel G has somewhere between 1/2 and 3/4 miles of frontage on Taylor Road. When Parcel G was sold, rail ran parallel to Taylor Road on the side across from it and sanitary sewerage was available on its southeast side. By virtue of its location and access to rail and utilities, Parcel G is superior to the subject property. In a statutory notice of deficiency issued to Ebben and his wife for the calendar year 1973 (docket No. 8473-77), respondent disallowed the Ebbens' deduction *609 claimed for charitable contributions of Whitney Farms of $23,857 to the extent that it exceeded $11,494.36, with the following explanation: The deduction claimed for charitable contributions from Whitney Farms Investment Company of $23,857.00 is not allowed to the extent of $12,362.64 because it has not been established that any amount in excess of $11,494.36 represents your pro-rata share of contributions paid by the partnership. Therefore, your taxable income is increased $12,362.64. [15]
In an amended answer, respondent alleged that the Ebbens' deduction for charitable contributions of Whitney Farms should be limited to $105.56, Ebben's pro rata share of the alleged fair market value of the subject property at the time of the donation. In statutory notices of deficiency issued to Kaufman and his wife (docket No. 2765-80) and Broad and his wife (docket No. 13766-80), respondent determined *610 that the fair market value of the subject property, net of encumbrances, was $3,016 (or $547,600 prior to reduction for the outstanding deed of trust ($3,016 + $544,584)). Respondent disallowed amounts claimed by Gilbert and Evelyn H. Dreyfuss (docket No. 7158-78) as charitable contribution deductions on account of the contribution of the subject property to Pitzer on their 1974 return. [16] *611 Respondent also disallowed amounts claimed by Kaufman and his wife (docket No. 18516-80) as charitable contribution deductions on account of the contribution of the subject property to Pitzer on their 1975 return. [17] *612 When the subject property was contributed by Kaufman and Broad to Whitney Farms, its basis to Whitney Farms was $548,000. Sec. 723. The basis to Whitney Farms of the subject property remained unchanged until December 28, 1973, when the property was gifted to Pitzer. As stated earlier, Whitney Farms, on its partnership return for 1973, indicated the fair market value of the subject property was $1,420,000. It reported no gain in connection with the contribution of the property. In amended answers filed in docket Nos. 13766-80 and 2765-80, respondent has alleged that if this Court finds that the subject property's fair market value exceeded its adjusted basis to Whitney Farms, then its transfer subject to the trust deed [18] gave rise to long-term capital gain pursuant to section 1011(b). OPINION Issue 1
Section 170 allows an individual a deduction for charitable contributions subject to certain percentage limitations and with a carryover of any excess contribution. See section 170(b) and (d). If the charitable gift is of property other than *613 money, the amount of the contribution is the fair market value of the property as of the date contributed reduced when necessary as provided in section 170(e)(1). Section 1.170A-1(c)(1), Income Tax Regs. The generally accepted definition of fair market value is set forth in respondent's regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170-1(c)(1), Income Tax Regs. The fair market value of property as of any given date is a question of fact, to be resolved by considering and weighing all relevant evidence in the record. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Respondent agrees that each of the petitioners is entitled to a charitable deduction under section 170 for the conveyance of the subject property to Pitzer. The fair market value of the property remains in dispute. Respondent's determinations in the notices of deficiency as to the fair market value of the subject property are presumptively correct, and the burden of proving higher values rests on petitioners. Welch v. Helvering,290 U.S. 111 (1933); *614 Rule 142(a). In his notices of deficiency to Kaufman and Broad respondent determined the fair market value of the subject property, net of encumbrances, was $3,016 (i.e., $547,600 prior to reduction for the outstanding deed of trust ($3,016 + $544,584)). In his amended answer in the Ebben case (docket No. 8473-77), however, respondent raised the issue of the subject property's fair market value being less than approximately $873,000, the amount apparently used in calculating the deficiency originally determined in such case. [19] *615 Therefore, respondent has the burden of proving that the fair market value is below such amount in the Ebben case. Rule 142. At trial petitioners offered the testimony of two experts and respondent of one. All the appraisers used the market data method. This method entails collecting sales data for sales of comparable properties, analyzing the data and making adjustments for differences between the comparables and the property being appraised which affect value, such as size, location, proximity of utilities, and availability of access. The values submitted by the three appraisers were: Peter L. Brennan (for petitioners)
1,420,000
Thomas W. Clark, Jr. (for petitioners)
1,117,000
Francis L. Blaesi (for respondent)
569,000
The valuations of the experts for each party were stated in terms of a specified value per acre. The parties first stipulated the acreage of the subject property, however, after trial of this case. See footnotes 8, 9, and 10, supra. Consequently, *616 both petitioners and respondent's respective positions respecting the total value of the subject property are somewhat different from the valuations of their respective expert witnesses. Respondent argues that the fair market value of the subject property as of December 28, 1973, was $588, 996: $1,000 per acre for the 75 acres zoned M and M-D and $600 per acre for the remaining 856.66 acres. Petitioners' position is that the subject property's fair market value as of December 28, 1973, was $1,427,769: an average of $2,000 per acre for the 609.03 acres composing the east tract and an average of $650 per acre for the 322.63 acres composing the west tract. To use the market data approach, it was necessary for the appraisers to determine the highest and best use of the subject property. The experts agree that the highest and best use of the west tract was for agriculture and that the approximately 75 acres zoned M and M-D had potential for industrial development. They disagree, however, on the highest and best use of the remainder of the east tract, that is, 534.03 acres. The report of respondent's expert is based on the highest and best use of the 534.03 acres being for agriculture. *617 Petitioners' appraisers treated all the east tract as having industrial potential. As of December 28, 1973, the 534.03 acres consisted of unimproved farmland, which was zoned U. The U zoning classification permits most residential and agricultural uses, but no industrial use. Thus, the 534.03 acres had no potential for industrial development, unless there was a possibility that it would be rezoned in the foreseeable future. Brennan and Vogel appraised the property in early 1974. In their appraisal report they stated that it had been mentioned at county offices that there was a possibility of all the east tract being rezoned to M for heavy industrial use, and that it should be feasible to obtain this rezoning "within a year or so." In preparing his valuation, petitioners' other expert, Clark, considered there to be a reasonable probability that the portion of the east tract zoned U could be rezoned for industrial development. In contrast, Blaesi testified that he had, at the time of preparing his appraisal, consulted the County of Placer's Planning Department and had been advised that it would not have considered rezoning any land to industrial use because 5,250 acres, most of *618 which were undeveloped, already were zoned for that purpose. Hence, Blaesi considered agricultural usage to be the highest and best use of the 534.03 acres. Petitioners, to support the opinions of their experts concerning the highest and best use of the 534.03 acres, introduced the testimony of two former Placer County officials: Sutton, who was employed as Director of Industrial Development by Placer County for 3 years commencing in August 1973 and Robert McHale (herein McHale), who succeeded Sutton as Director of Industrial Development for Placer County and was employed in such capacity until April 1980. For several reasons, we are far from convinced that in 1973 the ability to secure rezoning of the 534.03 acres was a certainty or even a probability. First, Sutton's testimony is much more supportive of Blaesi's opinion than the opinions of petitioners' appraisers. As Director of Industrial Development, Sutton had commenced negotiations in November 1973 for the preparation of the engineering report whose conclusions subsequently were accepted by the Placer County Board of Supervisors. He understood the report to conclude that land adjacent to the industrially-zoned property and *619 east of Fiddyment Road (which includes the disputed 534.03 acres herein) had potential to become industrial at an undetermined future time, when and if the demand was ever generated. According to Sutton, as of 1973, there was no need to rezone any land for industrial purposes in that part of Placer County where the subject property was located, since no more than roughly 10 percent of the industrial district had been developed. Second, McHale's testimony indicates only that he would have supported rezoning of the 534.03 acres for most industrial uses as of 1977 (when he was the Director of Industrial Development), and not whether there would have been support for such rezoning as of 1973, i.e., the time of Whitney Farms' contribution. Third, two sales (Dowd et al. to Bair et al. and Good-fellow to Lanza de Las Americas) on which Blaesi relied in evaluating the 534.03 acres were of parcels east of Fiddyment Road and adjacent to the industrial district, but not zoned for industrial use. Petitioners have failed to indicate any reason for concluding that these two parcels were less favorably situated than the 534.03 acres whose highest and best use is in dispute in terms of permitting *620 their purchasers to take advantage of any prospective expansion of the industrial district. For the foregoing reasons, we reject petitioners' contention that the 534.03 acres of the east tract zoned U should not be evaluated as agricultural property. Since the highest and best use of the 322.63 acres composing the west tract has been agreed to be for agriculture, we conclude that the valuation of 856.66 acres of the subject property should be based upon agricultural use. Petitioners' expert appraisers concluded that the agricultural portion of the subject property was worth $650 per acre as of December 28, 1973. On the other hand, Blaesi, respondent's appraiser, estimated that, as of December 28, 1973, the agricultural portion was worth $600 per acre. In our view Blaesi's valuation of the agricultural portion of the subject property at $600 per acre is supported by the evidence before us.[20] We agree with petitioners' assertion on brief that the sales of Parcels Nos. 1, 2, and 3 set forth in Table 1 are indicative of the value of the portion of the subject property having its highest and best use as agricultural property. Parcel No. 4, however, was extensively improved at the time *621 of its sale, whereas the subject property had no improvements. We, therefore, disagree with petitioners' further assertion that the sale price of Parcel No. 4, at least with no adjustment for the difference in improvements, should be accorded the same weight as the sale prices of Parcels Nos. 1, 2, and 3. "Comparable" sale 7 of Clark's reports was of property that already had been zoned for industrial use. The evidence before us indicating that any purchaser of this property could have secured access to Placer Boulevard by paving an assessor's parcel of 940 feet belies Clark's opinion that the property could only have been used for agriculture because it lacked access. In accordance with the foregoing, we conclude that the agricultural portion of the subject property had a per acre value of $600, or a total fair market value of $513,996 ($600 X 856.66). The valuation of the industrial-zoned portion of the subject property *622 presents an onerous task. Brennan and Clark concluded that the portion of the subject property they considered to have industrial potential was worth $2.000 per acre and $1,500 per acre, respectively. In contrast, Blaesi found the value of the industrially-zoned land to be $1,000 per acre. In their appraisal report, Brennan and Vogel list five sales as being of property "comparable" to the portion of the subject property regarded by them as having industrial potential. They then indicate, however, that since only incomplete information as to the financing used in two of the sales, whose reported prices were somewhat greater than the going rate, was available, they ascribed to those two sales considerably less weight than to the remaining three sales. The three sales upon which Brennan and Vogel principally relied are the sales of Parcels A, B, and C set forth in Table 2 in our findings of fact. To determine the fair market value of the portion of the subject property he considered to have potential for industrial development, Clark relied on the sales of Parcels A through F, inclusive, listed in Table 2, supra. The most "significant" of these sales, in Clark's view, was the sale *623 of Parcel A, since Parcel A is adjacent to the subject property. Although Clark's appraisal report indicates that he made an adjustment to the purchase price ($1,525,000) of Parcel A "for the small downpayment [of $35,000] that was made at the time of purchase," his report fails to show the amount of the adjustment he made.
In estimating the fair market value of the part of the property he regarded as having industrial potential, Blaesi primarily relied on his "comparable" sale no. 27. That sale is the same as Clark's sale 7 discussed earlier in this opinion. See p. 23, supra. Blaesi thought that the sale prices of Parcels B and C, which had locations and access superior to the subject property, established the maximum value per acre that the subject property is worth. We do not consider the evidence submitted by petitioners to establish that Blaesi's evaluation of the industrially zoned property at $1,000 per acre is erroneous. On brief petitioners submit that the sale of Parcel A reflected in Table 2, supra, and one of the sales to which Brennan and Vogel originally ascribed little weight support a per acre value for the 75 acres zoned for industrial use of $2,000. We are unable *624 to agree. As previously stated, Parcel A was sold for $1,525,000 (or $1,725.11 per acre). Of this amount, $35,000 was paid in cash and an indebtedness of $1,490,000 was secured by an all inclusive deed of trust for a 10-year term. The purchaser also prepaid $156,450 in interest and paid $28,550 into a reserve for taxes pursuant to the purchase. Respondent argues that, in light of the minimal downpayment made by the purchaser, the sale price of Parcel A is an unreliable indicator of value. Respondent's argument is premised on the well-established principle that fair market value must be measured in terms of the cash price realizable. See, e. g., WillowTerrace Development Co. v. Commissioner,345 F.2d 933, 936 (5th Cir. 1965); Kaplan v. United States,279 F. Supp. 709, 711 (D. Ariz. 1967). Consonant with this principle, the designated price of a sale on terms, such as the sale price of Parcel A, indeed may not reflect the fair market value of the property sold as of the date of sale. Cf. Epstein v. Commissioner,53 T.C. 459, 471 (1969). Unfortunately for petitioners, the evidence before us is wholly inadequate to reach any determination of the cash value of the sale price on *625 terms of Parcel A. The record fails to show such relevant details as whether the deed of trust contained an acceleration or "due on sale" clause, the interest rate payable on the note, and the prevailing discount rate applied to deed of trust notes by lending institutions in the Lincoln/Roseville area during the pertinent time. [21]
As to the 5th sale reflected in Brennan and Vogel's appraisal report of 400 acres for $3,375 per acre, we decline to attach as much weight to its sale price as petitioners claim it deserves. The transaction is one of the two aforementioned sales to which Brennan and Vogel ascribed little weight in evaluating the subject property. When preparing their appraisal, Brennan and Vogel thought the transaction was between related entities and hence, was not an arm's-length transaction. As mentioned earlier, they also lacked complete information concerning how the purchase was financed. After Brennan and Vogel's appraisal was prepared, Brennan, pursuant to the request of petitioners' counsel in the present case, reviewed the appraisal report and reinvestigated the data *626 and conclusions contained therein. In the course of his reinvestigation, Brennan learned that his and Vogel's sale 5 was not between related entities. Petitioners claim that its sale price, consequently, should be considered indicative of the value of the subject property. However, inasmuch as petitioners have not shown the details of the financing, if any, of the sale, we cannot tell whether the stated sales price corresponds to the actual fair market value of the property sold. In our view the sale most indicative of the value of the 75 acres of the subject property zoned for industrial use is the July 30, 1974, sale of 283.3 or 314.3 acres at $727.01 or $800 per acre (see footnote 11, supra) used as the 27th sale by Blaesi and the 7th sale by Clark. We have already discussed the availability of access to that land and concluded that its use was not limited to agriculture. As for Clark's testimony that the land was sold pursuant to an option granted before, and containing a price agreed to before, the date of sale, it is hearsay and more importantly, it fails to specify what effect, if any, the option had on the sale price.
The sales of Parcels B, C, and G which are set out *627 in Table 2 supra, are the sales of industrially-zoned properties that took place nearest to the valuation date. None of these properties, however, are identical to the property involved herein. Parcels B, C, and G have locations and access superior to the subject property and are nearer to rail and utilities. In addition, the industrially-zoned property whose value is at issue here is a part of a much larger parcel than Parcels B, C, or G which is to be valued in the aggregate. The foregoing factors indicate a lower value for the 75 acres than the selling prices of Parcels B, C, and G. Petitioners, however, describe the sales of Parcels B and C as "loss leaders," by which they mean the sales were made at less than the fair market values of the parcels to attract major corporations to the area. It is clear that having major corporations build their factories in the vicinity of the subject property would have been advantageous to the Carlsberg Financial Group, which controlled the grantors of Parcels B and C and also owned and/or controlled a substantial amount of other land in the vicinity. Yet, aside from the hearsay nature of petitioners' evidence concerning the "loss leader" *628 nature of these sales, the evidence indicates that these lands were not sold at prices appreciably below the sales prices of other lands in the area. For the reasons given above, we conclude that petitioners have failed to carry their burden of proving that the subject property's fair market value as of December 28, 1973, was greater than $588,996 ((75 acres X $1,000/acre) + (856.66 acres X $600/acre)). However, since in the Ebben case (docket No. 8473-77) respondent has the burden of proving that the subject property's fair market value is less than $873,000 (see page 17, supra), we think that the onus for failing to prove the cash value of designated prices of sales on terms must fall on respondent in that case. We, therefore, decline to hold that the fair market value of the industrially-zoned portion of the subject property was $1,000 per acre in the Ebben case. Instead based on all the evidence and with due regard to the burden placed on respondent, we conclude that there was a per acre value of $1,600 for the industrially-zoned 75 acres in the Ebben case. Consequently, we hold that the fair market value of the subject property as of December 28, 1973, in the Ebben case was *629 $633,996 ((75 acres X $1,600 per acre) + (856.66 acres X $600/acre)). One final note. Admittedly, our opinion produces inconsistent results. This disparity may seem odd, since in all dockets the same property is being valued. Although we wrestled with the existing record in an effort to obtain consistency, we found insufficient probative evidence to permit us to do so without regard to the location of the burden of proof. [22] *630 As indicated above, the onus, for failure to produce adequate evidence, must fall on the party on whom the burden of persuasion is cast. The parties themselves and their appraisers, who are familiar with the property to be valued and the market for it, would most likely have estimated the fair market value of the property more satisfactorily than this Court. Like the majority of cases dealing with the issue of valuation, this case should not have been referred to this Court for disposition. [23]
Issue 2
The remaining issue is whether Whitney Farms realized a capital gain upon its contribution of the subject property to Pitzer. Before we consider the substantive issue, we must treat a procedural complaint raised by petitioners. At trial respondent's counsel made an oral motion for leave to file amendments to respondent's answers in docket Nos. 13766-80 and 2765-80. Petitioners resisted the motion, asserting that to permit respondent to amend his answer at such a late date "would surprise most taxpayers in terms of the result." We granted respondent's motion from the bench. Respondent thereafter filed amendments to his answers, alleging that if this Court finds the subject property's fair market value exceeded the adjusted basis to Whitney Farms of the subject property, then its transfer subject to the trust deed gave rise to a long-term capital gain pursuant to section 1011(b). On brief, petitioners have renewed their objection *631 to our granting of respondent's motion for leave to amend his answers. This Court has adopted a liberal policy toward allowing amendments to the pleadings. See the Note explaining Rule 41(a) at 60 T.C. 1089 (1973). Rule 41 permits a party to amend his pleading after the case has been placed on a trial calendar with leave of court. It provides that such leave shall be freely given when justice so requires. The granting or denial of a request by respondent to amend his answer is a matter that is within the sound discretion of this Court. Commissioner v. Long's Estate,304 F.2d 136, 142-143 (9th Cir. 1962). If the objecting party will be unfairly surprised and substantially disadvantaged in his preparation for trial if the movant is permitted to amend his pleadings, then this Court will deny permission to amend the pleadings. See Helvering v. Edison Securities Corp.,78 F.2d 85, 91 (4th Cir. 1935); Schuster's Express, Inc. v. Commissioner,66 T.C. 588, 593-594 (1976), affd. 562 F.2d 39 (2nd Cir. 1977). [24]
Petitioners make no claim that they were disadvantaged in the presentation of their cases because of respondent's delay in asserting *632 his new theory. See Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973). It is clear that petitioners were prepared for the section 1011(b) issue being raised at the trial of these cases. Certainly, if respondent's delay has prevented petitioners from presenting evidence that could have given a different posture to their cases, petitioners have had ample opportunity to indicate that they were so prejudiced. Petitioners, on brief, have fully addressed respondent's legal theory. Furthermore, the fact that our consideration of respondent's section 1011(b) claim may expose petitioners to a liability that was unexpected by them is insufficient to warrant our denial of respondent's motion. Cf. Gerli v. Commissioner,73 T.C. 1019, 1033 (1980), revd. on other grounds 668 F.2d 691 (2nd Cir. 1982). [25] *633 Petitioners do not claim, and there is no evidence, that counsel for respondent's delay was attributable to bad faith or to dilatory motives. [26] Indeed, the section 1011(b) issue never came to the attention of respondent's counsel until approximately 2 months before the trial of the present case, when our opinion in Guest v. Commissioner,77 T.C. 9 (1981), in which the section 1011(b) issue was a question of first impression, was announced. In accordance with the foregoing, we adhere to our grant of respondent's motion to amend his answer under Rule 41. *634 Having decided that respondent is permitted to amend his answers to assert that the conveyance of the subject property gave rise to a long-term capital gain pursuant to section 1011(b), we must next decide the substantive issue of whether Whitney Farms' charitable gift of the subject property was a sale or exchange, so as to require Whitney Farms to calculate its adjusted basis in the subject property under section 1011(b). [27]
Section 1001 defines gain or loss from the sale or other disposition of property as the difference between the amount realized and the adjusted basis of the property provided in section 1011. Section 1011(a) sets forth a general rule for determining the adjusted basis of property for purposes of determining the gain or loss upon the property's sale or other disposition. Section 1011(b) provides that if under section 170 (regarding charitable contributions) a deduction *635 is allowable by reason of a sale, then the adjusted basis for determining the gain from such sale shall be that portion of the adjusted basis which bears the same ratio to the adjusted basis as the amount realized bears to the fair market value of the property. Respondent's position is that if, as we have found, the fair market value of the subject property exceeded its cost basis of $548,000 at the time of its contribution, then Whitney Farms' adjusted basis in the subject property for purposes of determining gain on its transfer should be calculated under section 1011(b). In support of his position, respondent relies on section 1.1011-2(a) (3), Income Tax Regs., and Guest v. Commissioner,supra. Petitioners respond that Guest was incorrectly decided. In 1959 the taxpayer in Guest purchased certain real properties for $67,500 cash and took the properties subject to nonrecourse mortgages of $2,989,000. In 1970 he made charitable contributions of those real properties subject to the nonrecourse mortgages, which then secured debts of $2,015,957. While the taxpayer held the properties, deductions for depreciation of $1,283,752 were taken on his tax returns. At the time the taxpayer *636 gifted the properties, their adjusted basis to him was $1,616,214. This Court held in Guest that since the taxpayer was relieved of nonrecourse indebtedness upon his disposition of the real properties, such disposition was required to be treated as a "sale or exchange" for purposes of determining whether his gain should be measured by using his adjusted basis in the properties as determined under section 1011(a) or 1011(b). In so holding, we relied upon the following language in Freeland v. Commissioner,74 T.C. 970 (1980) (finding that there was no reason to distinguish a foreclosure sale from a voluntary reconveyance by a mortgagor to a mortgagee of property encumbered by a nonrecourse mortgage for purposes of determining whether the reconveyance was a sale, so as to produce a capital loss, rather than an ordinary loss) (77 T.C. at 24): In either event, the mortgagor's interest in the property is terminated and title is transferred to someone else, and the mortgagor receives nothing out of the transaction. * * * There is no forgiveness of indebtedness in either case, although there is a change in the mortgagor's balance sheet or net worth. He no longer has the liability to account *637 for, nor does he have the assets. * * * We believe the holdings of Crane[28] and subsequent cases decided in the light of Crane mandate the conclusion that relief from indebtedness, even though there is no personal liability, is sufficient to support a sale or exchange. See Simon v. Commissioner,32 T.C. 935 (1959), affd. 285 F.2d 422 (3d Cir. 1960); Johnson v. Commissioner,59 T.C. 791 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974); First National Industries, Inc. v. Commissioner,404 F.2d 1182 (6th Cir. 1968), cert. denied 394 U.S. 1014 (1969).
Petitioners contend that our opinion in Guest erroneously rests on Freeland v. Commissioner,supra, and certain other cases, such as Russo v. Commissioner,68 T.C. 135 (1977), since the issue raised in those cases was whether the term "sale" in section 1211 and 165(f) encompassed a conveyance of property subject to nonrecourse indebtedness, rather than the meaning of the term "sale" for purposes of section 1011(b).
In Hotel Equities Corp. v. Commissioner,546 F.2d 725, 728 (7th Cir. 1976), affg. 65 T.C. 528 (1975), the court stated that there is a natural presumption *638 that identical words used in the same act are intended to have the same meaning. See also Kast v. Commissioner,78 T.C. 1154, 1162 (1982). We are not convinced that the circumstances surrounding the enactment of section 1011(b) provide any reason for this Court to conclude that Congress intended that the term "sale" for purposes of section 1011(b) have a less inclusive meaning than such term has in sections 1211 and 165(f). The legislative history of section 1011(b) provides no indication as to whether a transfer of property subject to an indebtedness is to be treated as a sale. [29] Although the only example contained in the legislative history of section 1011(b) refers to circumstances in which a taxpayer sold land with a fair market value of $20,000 to a charitable organization for his cost of $12,000, we are not persuaded that it demonstrates a congressional intent that such provision would be applicable only in similar circumstances. Neither does the fact that Congress enacted section 170 to encourage charitable contributions provide a persuasive rationale for ascribing a narrow meaning to the term "sale" for purposes of section 1011(b). Cf. Diedrich v. Commissioner,457 U.S. 191 (1982) *639 (recognizing that, to encourage gift transactions Congress has limited the tax consequences of such transactions, but refusing to find that a donor receives no taxable income when he gifts property on the condition that the donor pay the attendant gift tax). In enacting section 1011(b), Congress desired to eliminate an "unwarranted benefit" that it believed was allowed taxpayers. See H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, 235. Prior to the enactment of section 1011(b), a taxpayer who made a bargain sale of appreciated property to a charitable organization for an amount equal to or less than his cost basis in the property could obtain a charitable deduction for the difference between the property's fair market value and the selling price and escape taxation on all appreciation in the property. As a result, the tax benefits received by those taxpayers in the higher brackets who made bargain sales to charitable organizations would often exceed the amount of their charitable *640 gifts. With this background in mind, we think it is very doubtful that, for purposes of section 1011(b), Congress intended that the term "sale" be narrowly construed, so as to not include transfers to charitable organizations of properties subject to indebtedness. To the extent that taxpayers could continue to make such transfers without recognizing gain, the congressional desire to eliminate the unwarranted tax benefits perceived by it could easily be defeated.
For the foregoing reasons, we adhere to our carefully considered and reviewed opinion in Guest, and hold that Whitney Farms' transfer of the subject property to Pitzer is a "sale or exchange" [30] *641 to the extent it was relieved from the indebtedness secured by the deed of trust on the property. [31] Its adjusted basis for calculating gain under section 1001(a) on the transfer, accordingly, should be determined under section 1011(b), and its gain is equal to the difference between the outstanding indebtedness and the portion of its adjusted basis which bears the same ratio to the adjusted basis as the amount of the indebtedness bears to the fair market value of the subject property.
Decisions will be entered under Rule 155 in docket Nos. 8473-77, 7158-78, 2765-80, 13766-80, 18516-80, and 18308-81.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Gilbert Dreyfuss and Evelyn H. Dreyfuss, docket No. 7158-78; Donald Kaufman and Gloria Kaufman, docket Nos. 2765-80 and 18516-80; and Eli Broad and Edythe L. Broad, docket Nos. 13766-80 and 18308-81.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
3. Respondent orally amended his pleadings to increase the determined deficiencies in the event that adjustments to which petitioners agreed in the stipulation of facts, which were not reflected in the notices of deficiency, result in increased deficiencies. See sec. 6214. See Carey v. Commissioner,T.C. Memo. 1981-708↩ n. 5.
4. The parties agreed at trial to delete paragraph 12 of the stipulation of facts and the exhibit mentioned therein.↩
5. Inasmuch as petitioner-wives are parties herein solely because they filed joint returns with their husbands, the term petitioners will be used in reference to petitioner-husbands.
6. Petitioners, claiming that the appraisal reports in evidence were admitted only to show the basis of the experts' opinions and not to establish any disputed fact, object to certain findings of fact proposed by respondent on the ground that the proposed findings are based solely upon information contained in the various appraisal reports. However, at least twice during the trial, petitioners' counsel stated that respondent's attorney and he had reached an understanding that the appraisal reports submitted to the Court were offered as the experts' testimony-in-chief.
7. Vogel and Brennan computed the fair market value of the subject property based on the east tract being 606.3 acres and the west tract being 317.8 acres, rather than the stipulated acreages of the east tract and west tract of 609.03 acres and 322.63 acres, respectively.
8. Clark computed the fair market value of the subject property based on the east tract being 607.1 acres and the west tract being 317 acres, rather than the stipulated acreages of the east tract and west tract of 609.03 acres and 322.63 acres, respectively.↩
9. Blaesi computed the fair market value of the subject property based on a total acreage of 897.94 acres, rather than the stipulated acreage of 931.66 acres.↩
10. This sale was actually of a two-thirds interest in the property for $407 per acre.↩
11. The data reported by Clark for this sale are a size of 314.3 acres and a total selling price of $228,500, which result in a price per acre of $727.01. Blaesi, on the other hand, reports the following data on this same sale: a size of 283.3 acres and a total sales price of $226,640, which result in a price per acre of $800. These discrepancies are unexplained.↩
12. The appraisal report prepared by Brennan and Vogel shows Parcel A's sale date as November 1968. The record indicates that this property was sold twice: first in November 1968 for somewhat less than $1,300 per acre and then in July 1969 for $1,725.11 per acre. On brief, petitioners indicate that Brennan and Vogel inadvertently used the date of the earlier sale. ↩
13. Blaesi's appraisal report indicates that parcel B was zoned M (Industrial) by the City of Roseville, whereas Clark's appraisal report indicates that it was zoned M-2 (General Industrial) by the City of Roseville. This discrepancy is unexplained. There is no indication in the record as to the difference in value, if any, between land zoned M and land zoned M-2. ↩
14. The appraisals of Clark and of Brennan and Vogel report this sale as being made for $2,500 per acre, with Brennan and Vogel's report indicating the size of the parcel was 105 acres and Clark's report indicating its size was 103.2 acres. On the other hand, Blaesi shows the size of Parcel C as 103 acres and its selling price as $264,000, resulting in a per acre price of $2,563.11. In addition, whereas Clark's report indicates Parcel C was zoned M (Industrial), Blaesi's report indicates it was zoned M-DC (Industrial, Design Control). These discrepancies are unexplained.
15. On reply brief petitioners state that the notice of deficiency in the Ebben case was premised on the subject property being worth $873,000. There is, however, no indication in the notice of deficiency as to the value used by respondent in calculating the deduction allowed for charitable contributions.↩
16. On their Federal income tax return for the year 1973, Gilbert and Evelyn H. Dreyfuss showed charitable contributions for the year of $33,951.66, including a contribution of $26,262 explained as "Share From Partnerships Whitney Ranch Inv. Co. * * *." Mr. and Mrs. Dreyfuss, on this return, claimed a deduction for contributions of $19,567.48, based on the 50-percent limitation of adjusted gross income allowable for such deduction. Sec. 170(b)(1)(A). In their 1974 return, Mr. and Mrs. Dreyfuss carried over contributions from 1973 of $14,384.18 ($33,951.66 - $19,567.48), showed further contributions of $4,106.03, and deducted $17,396.27 for contributions. Of the $17,396.27 deducted, $13,290.24 was attributable to the claimed carryover from 1973. See sec. 170(d)(1)(A). Respondent in his notice of deficiency to Mr. and Mrs. Dreyfuss disallowed the deduction claimed for the $13,290 contribution carryover to 1974. In the notice, respondent explained that the disallowance was the result of an adjustment from an audit of Whitney Farms in which Mr. Dreyfuss was a partner and that the adjustment resulted in there being no allowable contribution carry forward from 1973. ↩
17. On their Federal income tax return for the year 1975, Kaufman and his wife (docket No. 18516-80) claimed a deduction for charitable contributions of $102,607.14. In his statutory notice of deficiency to Mr. and Mrs. Kaufman, respondent disallowed $101,817 of such deduction on the ground that an examination of Whitney Farms' books and records had established that in 1973 Kaufman's distributive share of Whitney Farms' charitable contributions was $814, rather than $236,363 as claimed in Kaufman's 1973 return. Respondent further explained that it had not been established that Kaufman had any unused charitable contributions available to carry forward to 1975.
18. The parties agree that the debt secured by the deed of trust was a nonrecourse liability.↩
19. As noted earlier, respondent failed to indicate the fair market value upon which he based the determination in his notice of deficiency issued to the Ebbens.See fn. 15, supra. Although there is no direct evidence in the record of the fair market value respondent determined, other evidence supports petitioners' statement on reply brief that respondent determined a fair market value of $873,000, or approximately that amount. Specifically, the record indicates that (1) respondent allowed the Ebbens a deduction for charitable contributions of Whitney Farms in the amount of $11,494.36, (2) Ebben held a 3.5 percent interest in Whitney Farms, and (3) when the subject property was conveyed to Pitzer, it was subject to a trust deed securing a debt of $544,584. By dividing $11,494.36 by 3.5 percent, we obtain a quotient of $328,410.28, and the sum of $328,410.28 plus $544,584 is $872,994.28.
20. Thus, the location of the burden of proof has no impact on our conclusion as to the fair market value of the agricultural part of the subject property. Our conclusion in this regard is, consequently, applicable to all the cases consolidated herein. (Cf. pp. 28-29)↩
21. See Scott v. Commissioner,T.C. Memo. 1979-29; Phelps v. Commissioner,T.C. Memo. 1974-205↩.
22. As mentioned earlier, the terms of sale of various transactions are not shown by the record. Additionally, although each of the appraisers listed parcels that he felt were comparable to the subject property, the Court was informed by none of the appraisers of the specific adjustments he made to the selling prices of those parcels to reflect differences between them and the subject property.
23. See e.g., Walker v. Commissioner,T.C. Memo. 1982-495; Willamette Industries, Inc. v. Commissioner,T.C. Memo. 1980-577↩.
24. See Spain v. Commissioner,T.C Memo. 1978-270↩.
25. Rule 41(a), is derived, in part, from Rule 15(a) of the Federal Rules of Civil Procedure (Fed. R. Civ. P.). Notes to Tax Court Rules of Practice and Procedure, 60 T.C. 1089 (1973). Fed. R. Civ. P. 15(a) has been construed to mean that a party may effectively resist an amendment to the pleadings on the ground that it will create "an unwarranted difficulty in the prosecution of his case," but not "on the ground that it will expose him to a possible liability." Poloron Products v. Lybrand Ross Bros. & Montgomery,72 F.R.D. 556, 561 (S.D. N.Y. 1976). See Chamberlin v. United Engineers and Constructors, Inc.,194 F. Supp. 647 (E.D. Pa. 1961); 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil, sec. 1487, p. 431 (1971).Inasmuch as Rule 41(a) is patterned after Fed. R. Civ. P. 15(a), these constructions are apposite in applying the Tax Court Rule. Cf. Stern v. Commissioner,74 T.C. 1075, 1084 (1980); Zaentz v. Commissioner,73 T.C. 469, 473-474↩ (1979).
26. Cf. Chanik v. Commissioner,T.C. Memo. 1972-174↩.
27. As respondent admits, he bears the burden of proving the applicability of section 1011(b), since it was not until his amended answers that he alleged that Whitney Farms' basis should be calculated under such provision. Rule 142(a). See also Turner v. Commissioner,68 T.C. 48, 50↩ (1977).
28. Crane v. Commissioner,331 U.S. 1↩ (1947).
29. See H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, 235-236; Jackson, "The New Rules Governing Bargain Sales to Charitable Organizations Under the Tax Reform Act of 1969," 24 Tax Lawyer 279, 280-281↩ (1971).
30. In Guest v. Commissioner,77 T.C. 9 (1981), we stated (at 25): The regulations properly apply section 1011(b) to both sales and exchanges and not merely to sales despite the sole use of that word in the statute. Sec. 1.1011-2(a)(1), Income Tax Regs.↩
31. Petitioners argue that their situation is distinguishable from the facts presented in Guest v. Commissioner,supra, because they took no deductions for depreciation of the property during the period they owned it. This factual distinction between the present case and Guest does not mandate a different result here. As we noted in Freeland v. Commissioner,74 T.C. 970, 982-983 (1980), the fact that a taxpayer realizes no tax benefits in the form of deductions for depreciation of property is not determinative of whether the taxpayer's transfer of the property is a sale. See also Guest v. Commissioner,supra,↩ at 21-22.